Hakim, Edward - Vol. I                    May 21, 2009
                    Monroe, LA

89

1       A.   Trade dress, that would go to the look

2  of the cup, in my opinion, my personal opinion.

3  Speaking from me, and not the not the

4  corporation, I think it would be.  The trade

5  dress would be the aesthetic look of the product,

6  that it would have secondary meaning.

7       Q.   And what is it about the look of the

8  product that is source indicating?  Or is there

9  anything about the look of the product that is

10  source indicating?

11       A.   That is source indicating?

12       Q.   Yeah.

13       A.   I don't know what you mean by source

14  indicating.

15       Q.   It indicates the source of the product.

16  Luv 'N Care.

17       A.   Well, its got that certain - its got

18  that certain look.  When I say feel, I don't mean

19  physical feel.  I mean its got a certain feel,

20  that you know - you almost know when you see a

21  Luv 'N Care product.  You just know it.  It's

22  something that you can't explain.  You just know

Hakim, Edward - Vol. I                          May 21, 2009
                        Monroe, LA

90

1    it when you see it.  You gotta say, oh, well, it
2    looks like Luv 'N Care product.  That's why, in
3    the survey that Royal King did, you know, they
4    did this survey, and these places that we don't
5    even sell to, and in their own survey on the
6    sports sipper, 34 percent of the people thought
7    that those were made by the same person, even
8    though they probably never saw Luv 'N Care's
9    product.  Its just got that certain look.  That
10   certain feel.
11        Q.   So, if I understand then, people just
12   look for the Luv 'N Care product?
13        A.   Because its got that certain look.  Its
14   got that certain feel.
15        Q.   You don't need to actually promote it
16   for people to look for it?
17        A.   Well, we haven't spent a whole lot of
18   advertising dollars, and what we have spent on
19   advertising dollars has, you know, really paid
20   off through our - through our retailers.  When
21   they know it, they see it.  Its got that - its
22   got that Luv 'N Care look.

This page intentionally left blank.

Hakim, Edward - Vol. I                    May 21, 2009
                    Monroe, LA

111

1       Q.    It is within the realm of your

2    responsibilities to be knowledgeable about that

3    advertising?

4       **A.    Somewhat, yes.**

5       Q.    What advertising are you aware of that

6    promotes the functional attributes of the gripper

7    cup?

8       **A.    Specifically, only promotes the**

9    **function attributes?**

10      Q.    No, no, I'm not separating, but I

11   understand it may do both, but my first question

12   is, what advertising are you aware of that

13   promotes functional attributes?

14      **A.    That may include some functionality?**

15      Q.    Sure.

16      **A.    All of the advertisement probably**

17   **includes some form of functionality.  You could**

18   **say that.  Anybody could say that, but what we do**

19   **is show the product for the aesthetic look of it.**

20   **You can't see the functionalities in an**

21   **advertisement.**

22      Q.    And you also show the trademarks, in

Hakim, Edward - Vol. I                                    May 21, 2009
                            Monroe, LA

115

1     in the magazines?

2         A.    Yes.

3         Q.    Okay, how?  By the advertising

4     allowances?

5         A.    We gave them the ads.  We designed the

6     ads, and we approved the ads, and we paid for the

7     ads.  We designed the ads, we approved the ads,

8     and we paid for the ads to be put in magazines.

9         Q.    But it's the advertising allowance?

10    That was the system?  The one that we discussed

11    yesterday, while you were here, while you were

12    listening to your brother Joe's testimony?  Is

13    that what you're talking about now?

14        A.    I don't know what you mean by

15    allowance.  We - I can only say it one way so

16    many times.  We physically design the ads, at our

17    office.  We physically approve those ads.  We

18    sent those ads to our customers to go in

19    magazines, and we paid for those ads.  So, that's

20    the best I can - that's the best I can answer it

21    for you.

22        Q.    Those ads ran in the United States?

Hakim, Edward - Vol. I                          May 21, 2009
                    Monroe, LA

116

1       **A.    They did.**

2       Q.    In what magazines?

3       **A.    I don't know the names of those**

4    **magazines.  I can get you the names of them.**

5       Q.    From what year to what year were you

6    running ads in magazines through your customers?

7       **A.    Since what Joseph Hakim gave you**

8    **yesterday.  It was a break down of those ads.**

9       Q.    2004?

10      **A.    Yes, and those are just the ads that we**

11   **paid for. Those are not the ads that they did on**

12   **their own.**

13      Q.    Did Luv 'N Care design those ads

14   subsequent – any of those ads subsequent to July

15   18, 2006?

16      **A.    I would think so, yes.**

17      Q.    And is the copy for those ads still at

18   Luv 'N Care?

19      **A.    We supplied whatever we had.**

20      Q.    To your lawyers?

21      **A.    Whatever you asked, we supplied.**

22      Q.    To your lawyers?

Hakim, Edward - Vol. I                                May 21, 2009

Monroe, LA

117

1        **A.    To our lawyers.**

2        Q.    So, if there's advertising, then its

3    been produced by the lawyers?

4        **A.    Whatever we had, we adhered to your**

5    **request, and we supplied it.**

6        Q.    Do you have any evidence of advertising

7    of the gripper cup that calls attention to the

8    design – to the designs that are asserted in this

9    litigation?

10       **A.    I would think all of the ads that we've**

11   **ever done show the design of the cup, unless it**

12   **would be an ad without a picture, and I don't**

13   **know of an ad without a picture.**

14       Q.    What about – has Luv 'N Care ever won

15   any aesthetic – any awards for the aesthetic

16   design?  Just for the aesthetic design of the

17   gripper cup product?

18       **A.    Oh, we've won so many awards, I don't**

19   **really know if you could just say it was just**

20   **aesthetics.  It was not entered in any art show,**

21   **if that's what you're asking me.**

22       Q.    What other awards, besides the Wal-Mart

Hakim, Edward - Vol. I

May 21, 2009

Monroe, LA

118

1    award, has Luv 'N Care won for the gripper cup?

2        A.    **Awards for the gripper cup.**

3        Q.    Any others besides the Wal-Mart award

4    that we discussed earlier?

5        A.    **Yes, many Wal-Mart sales awards.**

6        Q.    Sales awards?

7        A.    **By quarter, yes.**

8        Q.    Any other awards that were not Wal-Mart

9    awards?

10       A.    **Outside the U.S., or within the U.S.?**

11       Q.    Inside the U.S.

12       A.    **I'm not sure.  Personally, I'm not**

13   **sure.**

14       Q.    We were discussing some proprietary

15   materials that you used for the gripper cup.  Do

16   you also use proprietary materials for the hard

17   spout no spill cup?  Exhibit 36?

18       A.    **Do we use proprietary goods?**

19       Q.    Proprietary materials to construct the

20   product.

21       A.    **Yes, we do.**

22       Q.    Do you know what portion of the sales

Hakim, Edward - Vol. I

May 21, 2009

Monroe, LA

119

1      of the hard tipped no spill cup - the exhibit C -

2          A.    **Exhibit 36?**

3          Q.    Exhibit 36 and exhibit C to the

4      complaint, on the right - cup - do you know what

5      portion of the sales of that product are

6      attributable to the materials used to construct

7      it?

8          A.    **No.**

9          Q.    Do you know what portion of the sales

10     of the hard tipped sippy cup, that's asserted in

11     this case, are attributable to the Nuby trademark

12     that appears on the body of the cup?

13         A.    **I would say a fair percentage.**

14         Q.    More than half?

15         A.    **Can't pin it down to a half.  I know**

16     **the Nuby name is a trusted name, so it's going to**

17     **stop the consumer, and then what's in their head,**

18     **why they buy it, I think they buy it because they**

19     **trust the brand.  They assume the brand is going**

20     **to work, or they wouldn't buy it to begin with.**

21     **So, they're buying it for the aesthetic look of**

22     **it, because they trust it's going to work.  It's**

Hakim, Edward - Vol. I

Monroe, LA

May 21, 2009

120

1   made by Nuby.

2       Q.    Do you know what portion of the sales

3   of the hard tipped asserted no spill sippy cup

4   are attributable to the no spill trademark?

5       A.    You would have to ask that one again.

6   I think you got something twisted there.

7       Q.    We're talking about - I'm going to ask

8   you a series of questions about the hard tipped -

9       A.    Okay.

10      Q.    - no spill asserted sippy cup -

11      A.    Okay.

12      Q.    - which is the exhibit C on the right

13  to the complaint.

14      A.    That's right.

15      Q.    All right, are those sales - what

16  portion of those sales are attributable to the no

17  spill trademark?  I'm just showing you also, in

18  conjunction with these questions, defendant's

19  exhibit eight.

20      A.    The no spill trademark is not shown on

21  this cup.

22      Q.    Its shown on the advertising materials.

Hakim, Edward - Vol. I                              May 21, 2009
                     Monroe, LA

121

1    This is an excerpt from the web site – from Luv

2    'N Care's web site.

3        **A.    Oh, do I know what sales of this cup –**

4    **the success, or what percentage of the sales are**

5    **because of this web site page?**

6        Q.    Are because the product is marketed in

7    connection with a no spill, with a little TM,

8    which indicates a common law trademark.

9        **A.    Well, I don't know that.**

10       Q.    You don't know that?

11       **A.    I don't know that, personally.  You're**

12   **showing me a picture of a snapshot of a web site**

13   **that I've never seen, and you're asking me about**

14   **how much the sales of this cup, exhibit 36, is**

15   **attributed to this web site, that I've never**

16   **seen.**

17       Q.    Does –

18       **A.    I can't answer that.**

19       Q.    Does Luv 'N Care market the hard

20   tipped, no spill, exhibit C to the complaint cup

21   under a common law trademark for no spill?  To

22   your knowledge?

Hakim, Edward - Vol. I                                    May 21, 2009
                        Monroe, LA

122

1        A.    It's marketed as a no spill cup.  Yes,

2    it's marketed as a no spill cup.

3        Q.    Is it also marketed as a dual flow cup?

4        A.    Yes.

5        Q.    And do you know what portion of the

6    sales are attributable to the dual flow feature?

7        A.    They don't see that when they're buying

8    this cup.  It's not on this cup.

9        Q.    It's a feature though.

10       A.    That's a feature that the consumer is

11   not going to know about, obviously, until they

12   purchase it.

13       Q.    Or when they come back to buy it again,

14   right?

15       A.    Oh, yes, when they come back to buy it

16   again.  They've opened it up, taken the little

17   leaflet out, and read the leaflet.

18       Q.    So, do you know –

19       A.    I don't know.

20       Q.    You don't know what portion of the

21   sales of the hard tipped no spill cup are

22   attributable to the dual flow feature?

Hakim, Edward - Vol. I                                      May 21, 2009
                                   Monroe, LA

                                                                    123

1        **A.    I do not.**

2        Q.    Do you know what portion of the sales

3    are attributable to the no spill feature?

4        **A.    I do not.**

5        Q.    Do you know what portion of the sales

6    of the hard tipped cup are attributable to it's a

7    reversible valve? The reversible valve?

8        **A.    Right.**

9        Q.    Which allows it to go slow of fast?

10       **A.    Correct.**

11       Q.    Do you know what portion of the sales

12   are attributable to that valve being reversible?

13       **A.    No, I do not.**

14       Q.    Are there patents that cover the hard

15   tipped, no spill cup?

16       **A.    Yes.**

17       Q.    And do you know what portion of –

18   utility patents?

19       **A.    Yes.**

20       Q.    Design patents?

21       **A.    Utility.**

22       Q.    Just utility patents?

Hakim, Edward - Vol. I                          May 21, 2009
                    Monroe, LA

124

1        **A.    That's correct.**

2        Q.    There are no design patents that cover

3   the hard tipped cup?

4        **A.    I could be wrong.  I don't know, but I**

5   **know there's utility patents.**

6        Q.    Do you know what –

7        **A.    More than one patent.**

8        Q.    More than one patent?  Do you know how

9   many?

10       **A.    More than one.**

11       Q.    Patents?

12       **A.    Three to five.**

13       Q.    Three to five?  Patents pending also?

14       **A.    There's also patents pending.**

15       Q.    Do you know what portion of the sales

16  are attributable to the patent protection over

17  the exhibit C to the complaint product that's in

18  exhibit 36?

19       **A.    Six?  Do not.**

20       Q.    Do you know what portion of the sales

21  of the exhibit C to the complaint product, that's

22  exhibit 36, are attributable to the ease of use

Hakim, Edward - Vol. I                                    May 21, 2009
                         Monroe, LA

                                                                    125

1    of the hard spout?

2         A.    Do not.

3         Q.    To the robustness of the hard spout?

4         A.    Robustness?

5         Q.    Yeah, do you consider the hard spout of

6    this cup to be robust?

7         A.    Do I?

8         Q.    You designed it, right?

9         A.    Yeah, but your definition of robust -

10   what is your definition of robust?

11        Q.    Well, let's do this, as we did

12   yesterday.  You give me a working definition of

13   you of robust, and then I'll ask you if you agree

14   that this is a robust -

15        A.    We designed this cup to be fun and

16   bubbly, and look like it can be bought and used

17   by a European.

18        Q.    And also so it would function for its

19   intended purpose?

20        A.    Well, everything ever bought in the

21   world is functional, whether it's an automobile,

22   car, or glass, or -

Hakim, Edward - Vol. I                               May 21, 2009
                         Monroe, LA

                                                                126

1        Q.    But did you design the product -

2        **A.    - a paper clip even.**

3        Q.    But did you design the product to also

4    be functional, so it wouldn't spill, for example?

5        **A.    We designed the cup, and a cup is used**

6    **for a specific purpose.  Now, we designed this**

7    **cup with our look.**

8        Q.    And no function?

9        **A.    Obviously, a cup is functional, but the**

10   **look of the cup is non-functional.**

11       Q.    So, - but this cup, that's exhibit C to

12   the complaint, it's designed to have functions

13   too?  I understand you -

14       **A.    It's designed only for aesthetics.  We**

15   **have so many cups.  We have probably a hundred**

16   **different cups.  We designed the cup -**

17       Q.    Let me ask you this -

18       **A.    - for its aesthetics.**

19       Q.    Is the spout of the exhibit C to the

20   complaint, and exhibit 36 cup, hard and robust?

21       **A.    It's hard, and it's aesthetically**

22   **correct.**

Hakim, Edward - Vol. I                                      May 21, 2009
                          Monroe, LA

127

```
 1        Q.    Is it robust?

 2        A.    It's aesthetically correct.

 3        Q.    Is it perfect for toddlers with newly

 4   formed, sharp teeth?

 5        A.    We think it's perfect for toddlers.

 6        Q.    What portion of the sales - why?

 7        A.    We think it's perfect for toddlers,

 8   because we've enticed the mom or dad, or

 9   consumer, into buying it.

10        Q.    You don't think -

11        A.    She buys it because she trusts the name

12   Nuby, and it looks great.  It's sitting beside

13   Playtex, or any other brand, and it looks better

14   than Playtex's.  That's why she buys it.

15        Q.    Are there any -

16        A.    It looks better.  No other -

17        Q.    Are there any -

18        A.    - reason.  No other reason.

19        Q.    No other reason?  Not because it works

20   well?

21        A.    When you go buy a shirt, you buy a

22   shirt if you like it.  You buy a shirt if you
```

This page intentionally left blank.

137

1    continuing applications that will be confidential

2    that we can't access from PEAR.

3            MR. GUERRIERO:  So, you have the file

4    wrapper, but not the confidential continuing

5    applications?

6            MR. BURATTI:  We don't have a full file

7    wrapper, but like I said, the documents that

8    needed to be produced should have been those

9    documents that are in the possession, custody, or

10   control of Luv 'N Care, and would include their

11   version of the file wrapper, less the privileged

12   materials, but then we also haven't been produced

13   the privileged log that we asked for back before

14   discovery closed either.  So, we can't tell, you

15   know, what's missing from what.  I'll note that

16   that's seriously overdue.

17       Q.    Turning back to exhibit 42, Mr. Hakim,

18   this is a pretty comprehensive document, so I

19   want to try to keep it simple for you, so you're

20   not here all day.  Is - turn to exhibit figure

21   1B.  Figure one, sorry, on the first drawing

22   sheet.

Hakim, Edward - Vol. I                                      May 21, 2009
                            Monroe, LA

138

1          A.    Okay.

2          Q.    Is that exhibit 36?

3          A.    **Is this picture a picture of exhibit**

4    **36?**

5          Q.    Is that a picture, a graphical

6    representation, of the product that is exhibit

7    36?

8          A.    **No.**

9          Q.    What's different?

10         A.    **The cup is different.  It's a different**

11   **cup, and I think it's a snap on top.**

12         Q.    Any other differences?

13         A.    **I believe that's it.**

14         Q.    Does the cap have essentially the same

15   features except for the fact that it snaps on, as

16   the exhibit 36 -

17         A.    **Yes, it does.**

18         Q.    Does the valve have essentially the

19   same features as the valve that's in exhibit 36?

20         A.    **I don't know.**

21         Q.    Does the cup portion have essentially

22   the same non- aesthetic features as the product

Hakim, Edward - Vol. I                           May 21, 2009
                    Monroe, LA

                                                              139

1    that's exhibit 36?

2         A.   I do not know that.  I would have to

3    read the patent.

4         Q.   Is this the patent that you mentioned

5    was disclosing the valve earlier?

6         A.   That's one of more – there's more than

7    one patent.  So, I don't know if that's the

8    patent that covers that valve.

9         Q.   That's in the hard tipped cup?

10        A.   That is correct.  It's covered by

11   several patents.

12        Q.   Can you tell by looking at – actually,

13   yeah – for the record, exhibit 36 has the

14   packaging in it, and it identified patent number

15   6321931, and 6357620.

16        A.   That's neither one of these.

17        Q.   Right.  In fact, one of those patents

18   has been adjudicated invalid, right?

19        A.   That's correct.

20        Q.   When was the last time that you updated

21   the copy for the packaging in exhibit 36?

22        A.   I don't know how old that cup is, and

Hakim, Edward - Vol. I                          May 21, 2009
                    Monroe, LA

140

1   where it came from.

2        Q.   It's a Luv 'N Care cup though?

3        A.   That's true.  Well, it could have come

4   out of the sample room, and it could be five

5   years old.  So, I don't know.

6        Q.   Take a look now at figure five –

7        A.   Okay.

8        Q.   – in the 814 patent that is exhibit 42.

9        A.   Okay.

10       Q.   That appears to look more like exhibit

11  36.

12       A.   Yes.

13       Q.   And is it, in fact, a graphical

14  representation of the product that's exhibit 36?

15       A.   That's correct.

16       Q.   Flip back now to the next figure,

17  figure – I'm sorry, to figure 11.

18       A.   Okay.

19       Q.   Is that the snap on version of the cap?

20       A.   No.

21       Q.   Is that the screw on version of the

22  cap?

Hakim, Edward - Vol. I                                    May 21, 2009
                          Monroe, LA

                                                                141

1          **A.    Yes, it is.**

2          Q.    So, figure 11 is essentially the cap of

3    the exhibit 36 product?

4          **A.    That's correct.**

5          Q.    What about figure 12?

6          **A.    That's the screw on version.**

7          Q.    Figure 13?

8          **A.    That's also the screw on version.**

9          Q.    Figure 14?

10         **A.    That's the screw on version, with the**

11   **valve in place.**

12         Q.    If you turn to the front page of this,

13   exhibit 42, the 814 patent, -

14         **A.    Okay.**

15         Q.    And you're the inventor on this patent,

16   right?

17         **A.    That's correct.**

18         Q.    And in the first line of the abstract

19   on that front page, you describe an improved no

20   spill cup construction.  Is that right?

21         **A.    That's correct.**

22         Q.    And is that what this patent relates

Hakim, Edward - Vol. I                                   May 21, 2009
                        Monroe, LA

142

1    to?

2         **A.   I can't answer that.  I would have to**

3    **read the whole patent.**

4         Q.   So, you don't know whether or not this

5    patent relates to an improved no spill cup

6    construction?

7         **A.   I don't know if it relates to the**

8    **outside shape or whether it relates just to the**

9    **valve.  I can read it, and I can tell you.  Give**

10   **me about an hour, and I can go through it, and I**

11   **can tell you what it says, or it may be even**

12   **longer than an hour.**

13        Q.   We'll let you do that another time.

14        **A.   I think it speaks for itself.**

15        Q.   It does?  The patent speaks for itself?

16        **A.   That's right.**

17        Q.   Flip back to the claims on – do you

18   understand the column numbers up at the top, all

19   the way to the back of the document, and what

20   I'll do is I'll refer to these as column numbers,

21   and down the middle, there's line numbers.

22        **A.   Uh-huh.**

Hakim, Edward - Vol. I                                      May 21, 2009

Monroe, LA

143

1      Q.    In column – column 12, the first claim,

2  down at line 61, where it says, I claim an

3  apparatus –

4      **A.    Fifty-one or sixty-one?**

5      Q.    Sixty-one, thank you.   In 60, it says I

6  claim.

7      **A.    Okay.**

8      Q.    That's you, right?

9      **A.    That's correct.**

10     Q.    All right, and one is an apparatus

11  comprising?

12     **A.    That's correct.**

13     Q.    Do you know what the word comprising

14  means in the context of a patent claim?

15     **A.    It means it encompasses.**

16     Q.    And it can include other things?

17     **A.    Yes.**

18     Q.    If you turn back to claim 14 then, in

19  the next column, in column 13, –

20     **A.    Okay.**

21     Q.    It says there that the apparatus of

22  claim one, which was the beginning of the claim

Hakim, Edward - Vol. I                                    May 21, 2009
                        Monroe, LA

144

1    that we looked at a moment ago, comprises a cap

2    for a cup?

3        A.    I think we'll stipulate that whatever

4    it says, it says.

5        Q.    All right, and is that the case for all

6    the patents in which you're a named inventor?

7        A.    We would have to go through each and

8    every one of them, and I would stipulate that the

9    patents cover what the patents claim.

10       Q.    And that they describe what's

11   described?

12       A.    They say what they say, and they

13   describe what they say they describe.  If you

14   want to go through each one of them, line by

15   line, we'll do that.

16       Q.    Well, no, I don't need to go through

17   them line by line. I just need to understand what

18   your view of your patent is, and is that

19   generally your view of your patents?

20       A.    My view of my patents is it speaks for

21   itself, as what it is - it is what it is.

22       Q.    I'm going to pull - I'm pulling the

Hakim, Edward - Vol. I                                    May 21, 2009
                        Monroe, LA

145

1    packaging out of exhibit 36.

2         MR. BURATTI:  Joe, I'm just going to

3    write on here that this one is from 36, so we

4    don't get them confused while we're looking at

5    them side by side.

6         MR. GUERRIERO:  That's fine.

7         Q.    The other exhibit that I'm opening is

8    previously marked exhibit seven.

9         MR. GUERRIERO:  Exhibit seven?  Which

10   exhibit seven? Defendant's exhibit seven?

11        MR. BURATTI:  Seven, defendant's

12   exhibit seven, from the New York case.

13        Q.    I've got a copy of two advertising

14   inserts.  One of them is folded from exhibit 36,

15   and the other one is just inserted in a circle on

16   exhibit 7.  There is some differences between

17   those two packaging inserts in this exhibit C

18   product from the complaint, right?

19        A.    **That's correct.**

20        Q.    What are the differences?

21        A.    **Just me, personally, telling you?**

22        Q.    You're responsible for advertising as

Henderson Legal Services, Inc.

Hakim, Edward - Vol. I

Monroe, LA

May 21, 2009

146

1    part of your role as -

2        A.    I'm testifying for myself, personally,

3    today.  So, I can give you my - what I see,

4    personally, different.  The papers are two

5    different sizes.  Close to the same, but two

6    different sizes.  Exhibit DX 36 is slightly

7    smaller than DX 7.  There's a purplish blue band

8    at the top of DX 36. There's not a purplish blue

9    band at the top of DX 7.  There's a purplish blue

10   band at the bottom of DX 7 - 36, and there's not

11   a purplish band at the bottom of DX 7.  The type

12   of no spill cup is reversed out of the blue band

13   in DX 36, and the no spill cup wording itself is

14   in purplish blue on DX7, and the stripe of DX 36

15   you have the name Nuby, which is reversed out of

16   the purplish blue band with the TM to the bottom

17   right hand side.  On DX 7, the name Nuby itself

18   is in blue, and is not reversed out of a stripe.

19   You have a line under, a thin pen line under the

20   word no spill cup, which extends from the far

21   left all the way over, and touches the word Nuby

22   on the far right on DX 7.  On the top, right hand

Hakim, Edward - Vol. I

May 21, 2009

Monroe, LA

147

1    **corner of DX 7, you have verbiage that says form**

2    **SLA, and you do not have that on DX 36.**

3        Q.    Let me ask you something.  You don't

4    have to go through all the fine print.

5        **A.    You asked me to tell you the**

6    **differences.**

7        Q.    Right, but rather than you spending the

8    next 15 minutes reading the differences, I'll

9    agree, if you will, that there are probably

10   differences in the words that are used in the big

11   body of the text that's in the packaging.  From a

12   design standpoint, does the packaging on the

13   right, which is exhibit 7 packaging, have a

14   generally white side with pictures of the product

15   in it, whereas the packaging in exhibit 36 does

16   not?

17       **A.    They both have pictures on the right.**

18       Q.    Right, but does one have text ending

19   all at one place, and does the other one have

20   text coming across into the right side?

21       **A.    Sure, because they're two different**

22   **forms.   They're probably for two different**

This page intentionally left blank.

Hakim, Edward - Vol. I

Monroe, LA

May 21, 2009

173

1    A.    I would register what I can register.

2    Q.    So, you would register the trade dress,

3    if it was up to you, as CEO?

4    A.    Me, personally, I would register

5    whatever I could register, without just a sure

6    waste of money.  We make, literally, thousands of

7    products, have made thousands of products, and

8    still do make hundreds of products, and hundreds

9    and hundreds of version, so you would have to

10   spend millions and millions and millions of

11   dollars.  You just have to try to put your money

12   where you think it's best spent, and we think it

13   is best spent on R&D, and the guys who copied

14   just have to pay the price.  The pirates just,

15   you know, sometimes have to pay to get thrown off

16   the ship.  When they get burned a couple times,

17   they'll quit copying.  This guy that copies us is

18   notorious for copying everybody globally. He's

19   the biggest pirate on the globe.

20   Q.    That's your opinion?

21   A.    No, that's a fact.

22   Q.    So, you're –

This page intentionally left blank.

Hakim, Edward - Vol. I                              May 21, 2009
                        Monroe, LA

180

1      of the product?

2          **A.    No.**

3          Q.    Are there any design features of the

4      gripper cup that allow it to be manufactured at a

5      lower cost?

6          **A.    No.**

7          Q.    Are there any design features of the

8      gripper cup that are there to improve the

9      operation of the goods?

10         **A.    Yes.**

11         Q.    What are those?

12         **A.    Its got a cap on top of the cup so it**

13     **keeps it from spilling.**

14         Q.    Anything else?

15         **A.    No.**

16         Q.    So, the valve doesn't improve the

17     operation of the product?

18             MR. GUERRIERO:  I'm going go to object

19     to the form.  You're asking about design

20     features.

21         Q.    All right –

22             MR. GUERRIERO:  Valve is not a design

Hakim, Edward - Vol. I

Monroe, LA

May 21, 2009

181

1    feature of the outside of the cup.  It's the

2    inner working of the cup.

3        Q.   Are there any other design features,

4    besides the cap, that improve the operation of

5    the gripper cup?

6        **A.   I think the cap, in toto, would keep**

7    **any liquids from spilling out of the cup, if the**

8    **cup fell over.**

9        Q.   In toto, - I-N, space, T-O-T-O?

10       **A.   In toto, meaning everything included on**

11   **that screw cap.  Whatever it may be on that screw**

12   **cap, retains the liquid inside the cup, if the**

13   **cup falls over.**

14       Q.   And are there any design features of

15   the exhibit C, the hard tipped no spill cup, that

16   improve the operation of the product?

17       **A.   No.**

18       Q.   It has a cap too, though.

19       **A.   Well, it has a cap.  Keeps it from**

20   **spilling.**

21       Q.   Does the cap improve the operation of

22   the product?

Hakim, Edward - Vol. I

Monroe, LA

May 21, 2009

182

1    A.    It holds the liquid in.  So, if you

2    want to say, yeah, if the cup falls over, the

3    liquid can't get out if its got a cap screw on

4    top of it.

5    Q.    Does the spout of the exhibit C product

6    improve the operation of the product?

7    A.    Does the cap –

8    Q.    Or did you mean – when you said cap,

9    did you mean spout too?

10   A.    Spout and the cap.  Anything that's

11   included on that cap.

12   Q.    Improves the operation?

13   A.    It improves the operation by holding

14   the liquids in the cylinder.

15   Q.    I'm going to mark exhibit 43, United

16   States patent number 6357620.

17        MR. BURATTI:  Joe?

18   Q.    This is the 620 patent that's been

19   adjudicated invalid, right?

20   A.    If you say so.  I'm not sure.  If you

21   say that it is, it is, in this country.

22   Q.    Sure.  Well, it's a U.S. patent.  All

Hakim, Edward - Vol. I

May 21, 2009

Monroe, LA

183

1    right, and its been adjudicated invalid.  It was

2    very recent.  I thought you said earlier that you

3    knew that it was.

4         **A.    I know one - one of the patents are.**

5    **I'm not sure if this is the exact number or not.**

6    **I don't know.**

7         Q.    All right, if you flip to figure two of

8    the drawing sheets, page 2 of 17.

9         **A.    Okay.**

10        Q.    That's the graphical depiction also of

11   the exhibit C to the complaint product, the hard

12   tipped no spill cup?

13        **A.    That's correct.**

14        Q.    That's asserted against - the design of

15   which is asserted against Walgreens?

16        **A.    That's the overall look, yes.**

17        Q.    Same with figure five?

18        **A.    That's correct.**

19        Q.    And figures 11 through 14 are the cap

20   of that asserted product?

21        **A.    That's correct, with regards to the**

22   **look of the product.  With regards to the patent,**

Henderson Legal Services, Inc.

Hakim, Edward - Vol. I                    May 21, 2009
                    Monroe, LA

184

1    I believe this is the utility patent, and I don't

2    think we are applying – we are suing Walgreens

3    for a utility patent.

4         Q.    Does the 620 patent that's exhibit 43

5    generally describe a no spill cup construction?

6         A.    Yes.  Here again, this is a utility

7    patent, and it speaks for itself.  It is not a

8    design patent.  I think that's basic 101 patent

9    law, and I don't have to teach you.

10        Q.    You're the inventor of the 620 patent?

11        A.    Of the utility patent.  That's correct.

12        Q.    I'm going to mark as exhibit 44, United

13   States patent number 6321931.  Are you also the

14   inventor of this patent?

15        A.    That's correct.

16        Q.    And does figure two, and figure five,

17   graphically depict the exhibit C of the complaint

18   product that's asserted against Walgreens in this

19   case?

20        A.    Does the picture of the outside shape

21   of the product? Yes.

22        Q.    And similarly, is figure 11 through 14,

Hakim, Edward - Vol. I                                    May 21, 2009
Monroe, LA

185

1    the cap of the asserted product?

2        **A.    This is the cap that we're asserting**

3    **that Walgreens copied, yes.  The look of the cap.**

4        Q.    We'll mark as exhibit 45, United States

5    patent number 6994225.  Are you also the inventor

6    of this patent?

7        **A.    Yes.**

8        Q.    And is this patent directed to no spill

9    drinking products?

10        **A.    Yes, it is.**

11        Q.    Turn back to figures – figure eight

12    first.  Is figure eight a spout that was on a Luv

13    'N Care no spill gripper cup?

14        **A.    Yes.**

15        Q.    Was it on a gripper cup that existed

16    prior to 2007?

17        **A.    Yes.**

18        Q.    And is that product asserted against

19    Walgreens?

20        **A.    Is the spout asserted against**

21    **Walgreens?**

22        Q.    Is the spout part of a product that's

Hakim, Edward - Vol. I
Monroe, LA

May 21, 2009

186

1   asserted against Walgreens?

2       A.    Yes.

3       Q.    Is the figure nine spout also part of a

4   product that's asserted against Walgreens?

5       A.    Yes.

6       Q.    Does figure ten depict Luv 'N Care's no

7   spill gripper cup that's asserted against

8   Walgreens?  Sorry, figure ten.

9       A.    **The outside shape, yes.**

10      Q.    Side shape?

11      A.    **The outside shape, yes.**

12      Q.    The outside shape.

13      A.    **For all these.**

14      Q.    An overhead view?

15      A.    **The outside shape.  The physical shape**

16  **of the spout and the cup, yes.**

17      Q.    What about figure 11?

18      A.    **Yes.**

19      Q.    Figure 12?

20      A.    **Yes, not the functioning part, just the**

21  **outside aesthetics of it, the overall view.**

22      Q.    Are patents an important component of

Hakim, Edward - Vol. I                              May 21, 2009

Monroe, LA

187

1    the protection that Luv 'N Care uses for its

2    sippy cups?

3         A.    I can't speak for the company.  I can

4    only speak for myself.

5         Q.    In your opinion?

6         A.    Are patents important?

7         Q.    Yes.

8         A.    To any company.

9         Q.    Including for the protection of the

10   gripper cup?

11        A.    I think patents are important to any

12   company for any product that they have rights.

13        Q.    So, for the gripper cup too?

14        A.    Yes.

15        Q.    And for the hard tipped no spill cup?

16        A.    Right.

17        Q.    Has Luv 'N Care asserted patents in

18   litigation before?

19        A.    Yes.

20        Q.    When was the first time that Luv 'N

21   Care asserted trade dress in patent litigation?

22        A.    In Germany.