confronted Mr. Kruckman about infringing upon Luv n' care's intellectual property rights, he told us, "I understand that", you have do to [sic] what you need to do "to protect the product." But he did not care because, he said to us, Royal King had agreed to indemnify Walgreens." are self-serving speculation that lacks foundation.

60. Although there are many alternative ways to shape, design, color and style a hard-spout cup, Walgreens decided to sell a hard-spout cup that includes essentially the same unique combination of features and ornamental designs that form the trade dress of Luv n' care's hard-spout cup, which was Walgreen's best-selling cup. Edward Hakim Decl. ¶¶ 63-65.

RESPONSE: There are not "many alternative different and alternative ways" to shape, design, color and style a no-spill cup and that no-spill cup product designs distinguish one brand of cup from another" – rather, the record clearly establishes that there are only a few ways to design these products and that therefore the asserted traded dress is functional as a matter of law. See RSUF 162-205. Beyond that, Walgreens disputes this allegation because the proffered evidence is generalized and conclusory self-serving statements by an interested person, constituting hearsay, and/or lacking foundation and for reasons stated in Walgreens' Motion for Summary Judgment. As further support for this dispute, Walgreens states:

- Edward Hakim Decl. at ¶ 63 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence. The statement, to the extent it refers to anyone's statements or beliefs other than LNC's is hearsay and speculation.

- Edward Hakim Decl. at ¶ 64 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.

- Edward Hakim Decl. at ¶ 65 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence. The statement, to the extent it refers to anyone's statements or beliefs other than LNC's is hearsay and speculation.

61. Although there are many alternative ways to shape, design, color and style a hard-spout cup, Walgreens decided to sell a soft-spout cup that includes essentially the same unique combination of features and ornamental designs that form the trade dress of

Luv n' care's soft-spout cup, which was the best-selling cup in the United States.

Edward Hakim Decl. ¶¶ 66-70.

**RESPONSE: There are not "many alternative different and alternative ways" to shape, design, color and style a no-spill cup and that no-spill cup product designs distinguish one brand of cup from another" – rather, the record clearly establishes that there are only a few ways to design these products and that therefore the asserted traded dress is functional as a matter of law. See RSUF 162-205. Walgreens further disputes this allegation because the proffered evidence is generalized and conclusory self-serving statements by an interested person, constitutes hearsay, and/or lacks foundation and for reasons stated in Walgreens' Motion for Summary Judgment. As further support for this dispute, Walgreens states:**

- **Edward Hakim Decl. at ¶ 66 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.**

- **Edward Hakim Decl. at ¶ 67 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.**

- **Edward Hakim Decl. at ¶ 68 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.**

- **Edward Hakim Decl. at ¶ 69 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence. The statement, to the extent it refers to anyone's statements or beliefs other than LNC's is hearsay and speculation.**

- **Edward Hakim Decl. at ¶ 70 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.**

62. Walgreen chose to likewise sell its knockoff soft-spout cup in a clear plastic 2-pack shrink wrap, with a similar combination of features and ornamental designs. Edward Hakim Decl. ¶ 71.

**RESPONSE: Walgreens disputes this allegation because the proffered evidence is generalized and conclusory self-serving statements by an interested person. A cursory examination of the packaging illustrates all the differences – like the giant blue stripe and the mark WAGI on the Walgreens product. DE 52 Ex. B Fig.4. As further support for this dispute, Walgreens states:**

- **Edward Hakim Decl. at ¶ 71 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.**

63. Walgreen's took steps in its packaging to increase the likelihood of confusion.

Edward Hakim Decl. ¶¶ 72-74.

**RESPONSE:  Walgreens disputes this allegation because the proffered evidence is generalized and conclusory self-serving statements by an interested person, constituting hearsay, and/or lacking foundation.  Walgreens took steps to distinguish its own products, for example using Walgreens' "ticker symbol" WAG and adding an "I" so to indicate the source of the product was a Walgreen Co. product – hence the WAGI.  See DE 52 Ex. B Fig. 4.  As further support for this dispute, Walgreens states:**

- **Edward Hakim Decl. at ¶ 72 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.  The statement, to the extent it refers to anyone's statements or beliefs other than LNC's is hearsay and speculation.**

- **Edward Hakim Decl. at ¶ 73 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.  The statement, to the extent it refers to anyone's statements or beliefs other than LNC's is hearsay and speculation.**

- **Edward Hakim Decl. at ¶ 74 is a generalized and conclusory self-serving statement, which is not supported by any actual evidence.  The statement, to the extent it refers to anyone's statements or beliefs other than LNC's is hearsay and speculation**

## DEFENDANT WALGREEN CO.'S STATEMENT OF ADDITIONAL FACTS

**Plaintiffs' Products**

64. Plaintiffs Luv n' Care, Ltd. (LNC) and Admar International, Inc. (Admar) sell sippy cups designed for use by babies and toddlers. Declaration of Jason R. Buratti, Esq. Supporting Defendant Walgreen Co.'s Motion for Summary Judgment, Docket No. (DE) 42 (Buratti Dec) Ex. D.[1]

65. LNC's CEO testified "a sippy cup is – it's a cup an infant or young child can sip from. That's why it's called a sippy cup." Buratti Dec Ex. A at III:117:18-20.[2]

66. Plaintiffs have sold their asserted designs since 2004, but have no evidence of sales prior to that date. Buratti Dec. Ex. B at I:162:9-19.

67. On May 20, 2009, LNC's President Joseph Hakim testified:

> Q. And I want to make sure, my question is not when did you start, because you already established that you only know it was sometime prior to 2004. My question is about evidence. Sitting here today, the only evidence that you have shows that you used the asserted Luv 'N Care designs in 2004?
> A. That's all I have. I know it's at least 2004 back. When we changed - we changed our systems over, we don't have that data, that I could go back before that.

Buratti Dec. Ex. B at I:162:9-19.

---

[1] "Buratti Dec. Ex." means exhibits to Buratti Dec.

[2] Buratti Decl. Ex. A comprises Days I-III of the deposition of N.E. Hakim. Day I corresponds to the transcript from May 20, 2009, Day II corresponds to the transcript from May 21, 2009, and Day III corresponds to the transcript from May 29, 2009. Citations are to "Buratti Dec. Ex.A at [Day]:[Page]:[Line]" so that a citation to Day II at Page 3, Line 5 to Day II at Page 12, Line 9 appears in the facts as "Buratti Decl. Ex. A at II:3:5:-12:9. Similarly, Buratti Dec. Ex. B comprises Days I-II of the deposition of Joseph Hakim. Day I corresponds to the transcript from May 20, 2009. Day II corresponds to the transcript from May 29, 2009. During the course of preparing this opposition paper, we learned that a portion of the corporate testimony given by Joseph Hakim appears in corporate testimony by N. Edward Hakim. Plaintiffs have not yet provided their errata and signature pages, and the testimony is corporate, so Walgreens has not undertaken to determine precisely where the testimony is improperly attributed.

## Plaintiffs' Complaint Allegations Are Limited To The Gripper Cup And The No-Spill Cup.

68. In their May 2008 Complaint, plaintiffs claim Walgreens infringed unregistered trade dress in two "sippy cups" shown in Complaint Exs. B and C. DE 1 at ¶¶ 39-48 (facts), 82-84 (Count).

69. Plaintiffs' Complaint asserts the Gripper Cup against Walgreens. DE 1 at ¶¶ 39-43 & Ex. B.[3]

70. Plaintiffs' Gripper Cup is shown in Exhibit B to the Complaint. DE 1 at Ex. B.

71. On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  The overall - sorry, the trade dress.
>  The naked trade dress that's on the right side of
> exhibit B.
> A.  It comes in a variety of colors.  You
> could make it in any color.

Buratti Dec. Ex. A at II:66:7-11.

72. Plaintiffs' Complaint asserts the No-Spill Cup against Walgreens, DE. 1 at ¶¶ 44-48 & Ex. C.

73. Plaintiffs' No-Spill Cup is shown in Exhibit C to the Complaint. DE 1 at Ex. C.

74. On May 20, 2009, LNC's President Joseph Hakim testified:

> Q.  Is exhibit B to the complaint, an
> asserted design, contain an asserted design?
> A.  Is B an asserted design?  I believe so.
> Q.  And C?
> A.  I believe so.

Buratti Dec. Ex. B at I:27:12-16.

75. The Complaint does not allege that plaintiffs' alleged trade dress is "not functional." DE. 1.

---

[3] Citations to DE 1 & Ex. __ mean the Exhibit to that filing, not to this Statement of Facts.

76. Plaintiffs' Complaint does not accuse Walgreens of "copying" the product or the product packaging shown in Ex. A to the Complaint. DE. 1 at ¶¶ 30-38, Ex. A.

77. Plaintiffs' Complaint does not accuse Walgreens on "copying" the product or the product packaging shown in Ex. E to the Complaint. DE. 1 at ¶¶ 53-56, Ex. A.

78. LNC markets each of the asserted designs under Admar's registered trademark NUBY®. DE. 1 at ¶11.

79. LNC sells each of the asserted designs under Admar's registered trademark NUBY®. DE. 1 at ¶11.

80. The NUBY® mark appears prominently on the Gripper Cup in at least seven locations. Buratti Dec. Ex. A at I:31:22-32:15.

81. On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q. Right. No spill, Veri-Flo, and Nuby
> are registered trademark in the small print.
> That's four on the packaging, right?
> A. Right.
> Q. And then it also appears on the product
> itself?
> A. Yes, on the very face of the product.
> Q. How many times?
> A. To the fact [sic] of the product, which is
> engraved, that's on the - it's embedded and
> engraved in the silicone spout. Not good lighting
> in here. It may be on the bottom. Let's see.
> It's on the bottom.
> Q. So, seven times the word Nuby appears
> on the exhibit 39 product?
> A. That's correct.

Buratti Dec. Ex. A at I:31:22-32:15; Declaration of Garrett A. Barten, Esq. Supporting Defendant Walgreen Co.'s Opposition to Plaintiffs' Motion for Partial Summary Judgment (Barten MSJ Opp. Dec.) Ex. 1 (photograph of "exhibit 39" – plaintiffs' asserted Gripper Cup shown in DE 1 Ex. B).

82. The Complaint contains no Count alleging that Walgreens infringed any packaging trade dress. DE. 1.

83. The Complaint contains no specific description of packaging. DE 1.

84. Plaintiffs disclosed for the first time on May 20, 2009 packaging was being asserted against Walgreens. Buratti Dec. Buratti Dec. Ex. A at I:18:17-19.

85. On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q. Is packaging part of the trade dress
> that's asserted against Walgreens in this case?
> A. Yes.

Buratti Dec. Ex. A at I:18:17-19.

86. The only packaging depicted in the Complaint is for Complaint Ex. A, which plaintiffs assert against KMart. See DE 1 at ¶ 30-38.

87. The word "packaging" in Paragraph 83 of the Complaint refers to the Ex. A product asserted against Kmart. DE 1.

88. The Court ordered that discovery closed on May 1, 2009. DE 25, 27.

89. Plaintiffs did not state any allegation of packaging trade dress infringement against Walgreens until after discovery closed on May 1, 2009. DE 1; Buratti Decl. ¶ 17; Buratti Dec. Ex. I; Buratti Dec. Ex. A at I:18:17-19.

90. On May 28 and 29, 2009, Walgreens' counsel wrote to plaintiffs:

> We write concerning plaintiffs' intentions concerning the packaging trade dress claims allegedly asserted against Walgreens. It is not entirely clear to us whether plaintiffs actually intend to assert packaging trade dress claims against Walgreens. To the extent plaintiffs actually intend to assert trade dress in packaging, we believe these late-advanced claims are improper and should be dismissed.
>
> Certainly, no packaging claims are stated against Walgreens in the Complaint. However, after the May 1, 2009 close of fact discovery (and during the May 12 20 and 13 21 corporate depositions of Ed Hakim),

plaintiffs noted for the first time that they were asserting some sort of trade dress claims based on packaging. While it's still not entirely clear to us what those packaging claims are, they appear to include packaging (1) 1-pack Gripper Cup, (2) 2-pack Gripper Cup, (3) 1-pack Sport Sipper, and (4) No-Spill hard-spout cup. For (1) and (2), a Gripper Cup is shown without packaging in Ex. B to the Complaint. For (4), a No-Spill Cup is shown with an instruction sheet folded inside in Ex. C to the Complaint. For (3), a Sport Sipper is shown in Ex. A to the Complaint, but that product and packaging is specifically restricted in the body of the Complaint to direct claims at defendant KMart and not Walgreens. Plaintiff LNC's CEO confirmed during corporate testimony that no packaging is shown in Ex. B to the Complaint and that the insert in Ex. C is merely an instruction sheet.

It is fundamentally and manifestly unfair, not to mention prejudicial and costly, that Walgreens must defend against packaging claims that were not in the Complaint and that it did not have notice of until at or after the close of discovery. Please immediately advise us whether plaintiffs intend to assert trade dress in the packaging and provide us with a detailed statement of what each packaging claim is and when plaintiffs contend Walgreens had notice - with specific identification of the notice vehicle plaintiffs believe would support the Court's finding that these claims are properly noticed. We reserve the right to request the Court preclude any packaging claims by plaintiffs against Walgreens and will do so if we do not have a specific notice-supporting response from you by the end of the week.

Buratti Dec. Ex. I; see also Buratti Dec. ¶ 17.[4]; see also Barten Opp. MSJ Dec. Ex. 9.

91. As of the deadline for filing dispositive motions, plaintiffs had not responded to the letter

of the previous paragraph. Buratti Decl. ¶ 17.

92. Plaintiffs do not assert that Walgreens infringes Plaintiffs' NUBY® trademark. DE. 1.

93. No accused Walgreens product bears the word NUBY. See, e.g., DE 1 Ex. B, C.

## Plaintiffs' Non-Disclosure of Persons with Discoverable Information that They May Use at Trial (or Summary Judgment)

94. Plaintiffs served their Initial Disclosures on November 21, 2008. Barten Opp. MSJ Dec.

Ex. 3.

---

[4] The strikethrough was a correction to the original May 28, 2009 letter sent on May 29, 2009.

95. In their Initial Disclosures, Plaintiffs identified only Nouri E. Hakim, Joseph Hakim, Scott Carlson, and Nathan Shamosh as individuals having relevant information. Barten Opp. MSJ Dec. Ex. 3.

96. Plaintiffs have not supplemented their November 21, 2008 Initial Disclosures. See Barten Opp. MSJ Dec. ¶ 9 and Ex. 3.

97. Plaintiffs have never identified Timothy McQuillan, Jack Hakim, or Brandy Thomas as individuals likely to have discoverable information that Plaintiffs may use to support their claims or defenses. See Barten Opp. MSJ Dec. Ex. 5.

98. Walgreens served its First Set of Interrogatories on January 20, 2009. Barten Opp MSJ Dec. Ex. 2.

99. Walgreens Interrogatory No. 1 asks:

> Identify each person having knowledge of information relevant to the subject matter of this action and identify all documents relating to your response to this interrogatory, including the location and custodian of said documents.

Barten Opp MSJ Dec. Ex. 2

100. Plaintiffs responded to Interrogatory No. 1 on February 23, 2009. Barten Opp MSJ Dec. Ex. 4.

101. Plaintiffs' February 23, 2009 response to Interrogatory No. 1 identified N. Edward Hakim, Joseph Hakim, Scott Carlson, and Nathan Shamosh. Barten Opp MSJ Dec. Ex. 4 at 4-5.

102. The Court Ordered that discovery closed on May 1, 2009. DE 25, 27.

103. Plaintiffs supplemented their response to Interrogatory No. 1 on May 1, 2009. Barten Opp MSJ Dec. Ex. 5; see also Declaration of Garrett A. Barten Supporting Defendant Walgreen Co.'s Oppositions to Plaintiffs' Motion to Amend the Complaint, filed today ("Barten Do Not Amend Declaration") Ex. 7 (showing transmittal email).

104.  In their Supplemental Responses served on May 1, 2009, plaintiffs identified the

following individuals:  N. Edward Hakim, Joseph Hakim, Jack Hakim, Nouri E. Hakim,

Abraham Saul Hakim, Scott Carlson, Rebecca Jones, Nathan Shamosh, Steve Pickering, Scotty

Law, Wanda Chaney, Tim McQuillan, Damien Martinez, Mayer Lichtman, Maria Burnell, Mary

Reeves (Mary Paul), Karen Lee, E.L. "Bubba" Via, Jr., Bruce Isaacson, James Holley, Jeff

Kruckman, Brandy Thomas, Walter McCullough, Ted D'Amico, Nicole Provost-Heron, Andrea

Krick, Daniel Forbes, Dalbir S. Khurana, Wachira Sachdev.  Barten Opp MSJ Ex. 5.

## Plaintiffs' Trade Dress Charts Provided on the Last Day of Discovery

105.   Plaintiffs produced a trade dress chart on May 1, 2009 listing the allegedly

protectable elements of their asserted designs.  Buratti Dec. Exs. Q, R; Barten Do Not Amend

Declaration Ex. 6 (attaching Buratti Dec. Ex. Q, DX 41).

106.   Plaintiffs' trade dress chart does not identify Walgreens copied Plaintiffs' alleged

unregistered trade dress.  Buratti Dec. Exs. Q, R.

107.   On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  So, let me then, separate exhibit 40
> into a two page document that has the no spill
> sipper cup, and the hard tipped no spill cup.
> Exhibit 40 contains products that are asserted
> against Walgreens, correct?
> A.  That's correct.  On the no spill
> drinking cup, and the second page, which is the
> no spill sippy cup.

Buratti Dec. Ex. A at I:47:17-48:2; Buratti Dec. Ex. R (and Q).

108.   On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Now, I'll hand you exhibit DX 41, which
> contains documents bearing production numbers
> 203301 through 11. This is one -
> A.  That's correct.
> Q.  This is one big table, right?

60

A.  That's right.
Q.  Exhibit 41?  You said, that's correct?
A.  Yes.

Buratti Dec. Ex. A at I:48:3-10; Barten Do Not Amend Dec. Ex. 6 (transmittal email showing production numbers).

109.    Plaintiffs' May 1, 2009 trade dress chart describes the alleged trade dress of the

Gripper Cup to include the following elements: (1) a colored or tined bell-shaped cap; (2) an oval

clear silicone spout which is attached to a silicone top of the cap; (3) a colored cup, the cup

having a hood-like shape on it with a wave like appearance in the face-like area in front of and

below the hood; and (4) the combination and arrangement of said elements.  Buratti Dec. Exs. Q,

R.

110.    Plaintiffs' May 1, 2009 trade dress chart describes the alleged trade dress of the

No-Spill Cup to include includes the following elements: (1) a colored tinted generally

cylindrical cup with a wider portion; (2) a colored or tinted cap, having a cap sitting on a cap

look, with a spout having a bulb-like base and a relatively pointed top; (3) no outer packaging;

(4) a folded inner paper insert; and (5) the combination and arrangement of the aforesaid

elements.  Buratti Dec. Ex. Q-R.

**Plaintiffs' Officers, Employees and Agents, Including Undisclosed Individuals and Individuals Who Testified They Had No Knowledge, Gave Summary Judgment Declarations that Change Plaintiffs' Trade Dress Claims and Are Inconsistent with Plaintiffs' Initial Disclosures**

111.    Plaintiffs' motion for partial summary judgment is based primarily on the self-

serving, conclusory declarations of their employees, including Nouri Edward Hakim (CEO and

founder of Luv n' Care and President of Admar), Jack Hakim (President of Luv n' Care and

Vice-President of Admar), Nathan Shamosh (Vice President and Director of Sales for Luv n'

Care), and Tim McQuillan (Luv n' Care's Sales Representative since 1987). See DE 47, 48, 50, 52, 54.[5]

112.    Plaintiffs' motion for partial summary judgment and supporting declarations describe the elements of the alleged trade dress differently than the May 1, 2009 trade dress charts. DE 49 at 12 & n.3 & Ex. 3; DE 52 ¶ 36, 37.

113.    Timothy McQuillan and Jack Hakim gave declarations supporting plaintiffs' motion for summary judgment. DE 48, 50.

114.    An Affidavit of Brandy Thomas (Thomas Affidavit) was exhibited to Plaintiff Luv n' Care's CEO's declaration supporting plaintiffs' motion for summary judgment. DE 52 Ex. 5.

115.    Plaintiffs' November 21, 200 Initial Disclosures did not identify Timothy McQuillan, Jack Hakim or Brandy Thomas. Barten Opp MSJ Dec. Ex. 3.

116.    Plaintiffs' February 23, 2009 response to Interrogatory No. 1 did not identify Timothy McQuillan, Jack Hakim or Brandy Thomas. Barten Opp MSJ Dec. Ex. 4.

117.    The first time Plaintiffs identified Timothy McQuillan, Jack Hakim, and Brandy Thomas as having knowledge relevant to the subject matter of this action was in their May 1, 2009 Supplemental Response to Interrogatory No. 1. Barten Opp MSJ Dec. Ex. 5.

118.    The Thomas Affidavit is dated December 17, 2008 but describes events that allegedly occurred "in approximately the summer of 2007. DE 52 Ex. 5 at ¶ 3 and notary block.

119.    The Thomas Affidavit states that "Upon learning of this mistake I agreed to give this affidavit." DE 52 Ex. 5

120.    On May 20, 2009, Joseph Hakim testified:

# REDACTED

---

[5] RSUFs 1, 2, 4-6, 9-18, 20-38, 40-43, 45, and 48-63 each depend upon generalized and conclusory, self-serving and speculative or unsupported paragraphs of Plaintiffs' declarations.

REDACTED

REDACTED

Barten Opp MSJ Dec. Ex. 9 84:1-86 :9;

REDACTED

REDACTED

REDACTED

Barten Opp MSJ Dec. Ex. 9 at 90:2-93:20;

REDACTED

Barten Opp MSJ Dec. Ex. 9 at 95:19-21; and

REDACTED

Barten Opp MSJ Dec. Ex. 9 at 97:12-21.

121.    Nathan Shamosh gave a declaration supporting plaintiffs' motion for summary judgment.  DE 47.

122.    Nathan Shamosh testified he has no personal knowledge as to what products were sold to Walgreens.  Barten Opp MSJ Dec. Ex. 6.

123.    Plaintiffs' Initial Disclosures identifies Mr. Shamosh as having discoverable information that they may rely upon at trial regarding "Sales and distribution of Plaintiffs' products including the infringing products sold by Defendants, damages to sales, lost profits, damage to the reputation and good will of Plaintiffs, and deceptive and unfair trade practices by defendants."  Barten Opp MSJ Dec. Ex. 3 at 4.

124.    On  May 7, 2009, Nathan Shamosh testified:

# REDACTED

Barten Opp MSJ Dec. Ex. 6 at 43:7-12.

125.    Nathan Shamosh testified he has no personal knowledge as to which LNC products were sold by Walgreens marked with a "Wow" price point.  Barten Opp MSJ Dec. Ex. 6 at 46:2-4.

126.    Nathan Shamosh testified:

# REDACTED

Barten Opp MSJ Dec. Ex. 6 at 46:2-4.

127.    Nathan Shamosh testified he has no personal knowledge as to who determined the price points for Walgreens when Walgreens was a customer for LNC. Barten Opp MSJ Dec. Ex. 6 at 46:12-14.

128.    On  May 7, 2009 Nathan Shamosh testified:

# REDACTED

Barten Opp MSJ Dec. Ex. 6 at 46:12-14.

129.    Nathon Shamosh testified he had no involvement with the dealings with Walgreens until Jack Ralph Hakim retired in about the last year-and-a-half.  Barten Opp MSJ Dec. Ex. 6 at 46:20-23.

130.    On May 7, 2009 Nathan Shamosh testified:

# REDACTED

Barten Opp MSJ Dec. Ex. 6 at 46:20-23.

131.    Nathan Shamosh testified he has no personal knowledge as to whether Walgreen's sale of product has damaged the reputation of LNC. Barten Opp MSJ Dec. Ex. 6 at 110:4-8.

132.    On May 7, 2009 Nathan Shamosh testified:

# REDACTED

Barten Opp MSJ Dec. Ex. 6 at 110:4-8.

133.     Nathan Shamosh testified he has no personal knowledge as to whether plaintiffs' products have been sold by LNC without the word Nuby on it.  Barten Opp MSJ Dec. Ex. 6 at 120:11-14.

134.     On May 7, 2009 Nathan Shamosh testified:

# REDACTED

Barten Opp MSJ Dec. Ex. 6 at 120:11-14.

135.     Nathan Shamosh testified he has no personal knowledge as to whether Walgreens has ever bought the sport sipper made by LNC. Barten Opp MSJ Dec. Ex. 6 at 200:4-7.

136.     On May 7, 2009 Nathan Shamosh testified:

# REDACTED

Barten Opp MSJ Dec. Ex. 6 at 200:4-7.

137.     On May 7, 2009 Nathan Shamosh testified:

# REDACTED

Barten Opp MSJ Dec. Ex. 6 at 200:10-14.

138.     Nathan Shamosh testified he has no personal knowledge of plaintiff Admar International. Barten Opp MSJ Dec. Ex. 6 at 200:15-17.

139.     On May 7, 2009 Nathan Shamosh testified:



REDACTED

Barten Opp MSJ Dec. Ex. 6 at 200:15-17.

140.    Nathan Shamosh testified he did not deal directly with Walgreens. Barten Opp

MSJ Dec. Ex. 6 at 213:25-214:1-3.

141.    Nathan Shamosh testified:

REDACTED

Barten Opp MSJ Dec. Ex. 6 at 213:25-214:1-3.

142.    Nathan Shamosh's counsel acknowledged that Mr. Shamosh testified at least

eight times during his deposition that he had no personal involvement with Walgreens.  Barten

Opp MSJ Dec. Ex. 6 196:12-17.

143.    Nathan Shamosh testified:

REDACTED

Barten Opp MSJ Dec. Ex. 6 196:12-17.

144.    Exhibits 1 and 2 to Mr. Shamosh's Declaration constitute or contain hearsay.  See

DE 47 at Exs. 1, 2.

145.    Exhibits 1 and 2 to Mr. Shamosh's Declaration lack foundation.  See DE 47 at

Exs. 1, 2.

**Plaintiffs' Arguments of Lies, Deception and Copying Are Based On Inadmissible Evidence Contradicted by Walgreens' Testimony**

146.     Plaintiffs claim Walgreens "lied" to induce Plaintiffs into two more shipments at the agreed upon price. DE 49 at 2-4.

147.     An email plaintiffs identified in this context (DE 49 at DE 48 ¶ 38-41 & Ex. 2), from Walgreens category manager, Jeffrey Kruckman, states "let me make two 2 more buys to get through the ads I have in the system...." DE 48 Ex. 2.

148.     The email is consistent with Mr. Kruckman's other statements to plaintiffs and their agents that he sought to "cover my planning." DE 48, McQuillan Dec., at Ex. 4.

149.     On May 13, 2009, Jeffrey Kruckman testified:

> Q.    What is expected of you as a buyer and a
> category manager?
> ***
> A.    To obtain the best quality products and
> programs at the absolute best prices to give our
> consumer the best value possible while increasing
> shareholder value.

Barten Opp. MSJ Dec. Ex. 10 at 246:22-247-5.

> Let's talk about Exhibit 13 first. What
> list of attributes are you looking for when you
> evaluate a sample corresponding to Exhibit 13?
> A.    Any number of possible things from what
> I feel it can hold as a retail price point to what
> it cost me to handle it, what it cost to acquire
> it, what the product will merchandise like in the
> stores and how much of a statement that I can make
> to the consumer. Will it make a nice, colorful
> display? Will it be worthy of shelf space or table
> space? The attributes are endless. There's no one
> thing. I mean, I could go on for a long time.
> What the name of the product is, can we change the
> name of the product, can we play with packaging.
> There are dozens of things that you do. It's all
> about being the best value in mom's perception.
> It's all about the customer at Walgreens.
> Q.    For the accused product in 13, what

71

retail price point were you looking for?
A.   I was looking for that item to be at
approximately a $3 retail.

Barten Opp MSJ Dec. Ex. 10 at 318:11-319:7

Q.   So you were looking for a lower cost on
the Exhibit 13 [an accused Walgreens' product
sold under the mark WAGI] product than you
had for Nuby products?
A.   In conjunction with being a better
value, yes.
Q.   With respect to being a better value,
what goes into that?
***
A.   A better performing product.

Barten Opp. MSJ Dec. Ex. 10 at 322:15-24.

150.        Walgreens' category manager and buyer, Jeffrey Kruckman, repeatedly testified

he found a better consumer value than plaintiffs offered, as exemplified by this excerpt:

Q.   But was a factor in this particular
case?
A.   The main factor was our $3 price point.
Q.   So it was important to you to have a $3
price point; is that correct?
A.   That was part of our WOW strategy that
was on Exhibit 13 as well as the Luv n' care
product.
Q.   Were you trying to give the consumer a
good value?
A.   I have stated that several times.
That's my job to give the consumer a good value.
Q.   Did you feel that you were giving the
consumer a good value?
A.   I know that I gave the consumer a good
value.
Q.   Were you asking the consumer to evaluate
one competitor's product against another to
determine if there was good value?
A.   Not at all.
Q.   You were just asking them to randomly
pick a product without knowing what the other
products were like?

> A.    This product on the shelf has no
> relation other than the fact that it's a sippy cup
> with all of the rest of the sippy cups.

Barten Opp. MSJ Dec. Ex. 10 at 325:21-326:22.

151.    Mr. Kruckman informed plaintiffs that "due to the price increases that Luv 'N Care is looking for we have had to find an alternate source for the WOW! Product going forward to maintain our current price points." DE 49 Ex. 5.

152.    Plaintiffs argue in their motion that Walgreens "misleadingly transitioned consumers." DE 49 at 2-4.

153.    Plaintiffs provide two photographs that allegedly depict LNC products next to Walgreens products. DE 52 Ex. 4.

154.    The two photographs are grainy. DE 52 Ex. 4.

155.    The two photographs are barely discernible. DE 52 Ex. 4.

156.    The two photographs are unauthenticated. DE 52 Ex. 4.

157.    The two photographs lack foundation. See generally DE 52 & Ex. 4.

158.    Were the photographs admissible, they only show a single instance of such an event having happened at a single Walgreens store. DE 52 Ex. 4.

159.    Nothing in the two photographs indicates a Walgreens customer could not have placed the items on the shelves as depicted. See DE 52 & Ex. 4.

160.    On May 13, 2009, Jeffrey Kruckman testified:

> Q.    You were just asking them to randomly
> pick a product without knowing what the other
> products were like?
> A.    This product on the shelf has no
> relation other than the fact that it's a sippy cup
> with all of the rest of the sippy cups.
> Q.    And you feel that a consumer would pay
> no attention to any other cup on the market when

> buying this product?
> A.   If a consumer is in the market to buy
> this product, they are not a brand shopper and
> would not perceive that as being any other need to
> look.  This is a price point item.

Barten Opp MSJ Dec. Ex. 10 at 326:17-327:5.

161.    There is no evidence that this happened in any more than one store.  See DE 52 &

Ex. 4.

## Plaintiffs' Alleged Trade Dress Elements In The Gripper Cup And No-Spill Cup Are Commonly Used By Numerous Competitors And Functional

162.    Plaintiffs ignored evidence of competitors' cups (other than Walgreens' cups) in

their Motion.  See generally DE 49.

163.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified that there are "roughly

12 other competitors in the market":

> Q.  So, that's roughly 12 other competitors
> in the market, right?
> A.  I would think so.

Buratti Dec. Ex. A at I:72:22-73:2.

164.    Playtex is a competitor of LNC. Buratti Dec. Ex. A at I:69:16-73:4.

165.    Gerber is a competitor of LNC. Buratti Dec. Ex. A at I:69:16-73:4.

166.    Sassy/Mam is a competitor of LNC. Buratti Dec. Ex. A at I:69:16-73:4.

167.    First Years is a competitor of LNC. Buratti Dec. Ex. A at I:69:16-73:4.

168.    Even Flo is a competitor of LNC. Buratti Dec. Ex. A at I:69:16-73:4.

169.    Munchkins is a competitor of LNC. Buratti Dec. Ex. A at I:69:16-73:4.

170.    ABC/Development is a competitor of LNC. Ex. A at I:69:16-73:4.

171.    Avent is a competitor of LNC. Buratti Dec. Ex. A at I:69:16-73:4.

172.    Playskool is a competitor of LNC. Buratti Dec. Ex. A at I:69:16-73:4

173.    Plaintiffs testified that there "could be 30 or 40 or 20" competitors in the sippy cup market. Buratti Dec. Ex. A at I:73:22-74:2.

174.    This Figure shows exemplary sippy cups made by competitors. Buratti Dec. Exs. F, G.

### Figure:  Exemplary Competing Product Designs



### Gripper Cup

175.    Plaintiffs' trade dress chart alleges an element of the Gripper Cup trade dress is "a colored or tinted bell-shaped cap." Buratti Dec. Ex. A at I:65:20-66:10; Buratti Dec. Exs. Q, R.

176.    Competitors of plaintiffs in the sippy cup market sell sippy cups having a colored or tinted bell-shaped cap. Buratti Dec. Ex. A at I:75:17-80:9; Buratti Dec. Ex. F.



177.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  All right, do the other competitors, to
> Luv 'N Care's knowledge, use colored caps on
> their sippy cups?
> A.  I would think both categories use
> colored caps, in one form or another.
> . . .
> Q.  No one else uses a bell shaped cap?

> A.  Royal King does.
> Q.  Anybody else, to Luv 'N Care's
> knowledge?
> A.  I think recently Munchkins is doing
> that.

Buratti Dec. Ex. A at I:75:17-77:16.

178.    Plaintiffs' trade dress chart alleges an element of the Gripper Cup trade dress is

"an oval clear silicone spout which is attached to a silicone top of the cap." Buratti Dec. Ex. A at

I:65:20-66:10; Buratti Dec. Ex. Q, R.

179.    Competitors of plaintiffs in the sippy cup market sell sippy cups having an oval

clear silicone spout which is attached to a silicone top of the cap. Buratti Dec. Ex. A at I:75:17-

80:9; Buratti Dec. Ex. F.



180.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Do any of those other competitors that
> we've discussed, use an oval, clear, silicone
> spout?
> A. Two.  Royal King - when I tell you
> Royal King, I can say Royal King/Walgreens.
> They're the same person.
> ......
> Q.  All right, does any other competitor
> attach the silicone top, the silicone spout to
> the silicone top of the cap?
> A.  That's my design.  The only people who
> copied is Walgreens and Munchkins.
> Q.  Munchkins copied?
> A.  Yes.
> Q.  Do any of the other competitors use a
> colored cup?
> A.  Everybody uses a colored cup.

Buratti Dec. Ex. A at I:77:19-78:22.

181.    Plaintiffs' trade dress chart alleges an element of the Gripper Cup trade dress is "a colored cup, the cup having a hood-like shape on it with a wave like appearance in the face-like area in front of and below the hood." Buratti Dec. Ex. A at I:65:20-66:10; Buratti Dec. Exs. Q, R.

182.    Competitors of Plaintiffs in the sippy cup market sell sippy cups having a colored cup, the cup having a hood-like shape on it with a wave like appearance in the face-like area in front of and below the hood. Buratti Dec. Ex. A at I:75:17-80:9; Buratti Dec. Ex. F.



183.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  All right, so, other competitors use
> hood like shapes?
> A.  Yes.
> Q.  Other competitors have cups with wave
> like appearances on them?
> A.  Yes.
> Do other competitors have cups with
> wave like appearances in face like areas?
> A.  Yes.
> Q.  And do those face like areas appear in
> front of and below the hood portions of the cups?
> A.  Yes.

Buratti Dec. Ex. A at I:79:20-80:9.

184.    There are no other elements of the Gripper Cup asserted against Walgreens in addition to the elements listed in Exhibits Q and R. Buratti Dec. Ex. A at I:65:20-66:10.

185.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Now, for the exhibit B product, that's
> on the first page of exhibit 40, are there any
> other elements besides the four elements that are
> bulleted there, that are the naked product trade

dress that's asserted against Walgreens?
A. I don't believe so.
Q. We need to lock you down on this, all
right? We need to understand that there's no
more elements coming. That's part of the purpose
of this deposition, especially when we agreed to
conduct them afterwards, so I want to get a yes
or a no from you.
A. I don't believe so.

Buratti Dec. Ex. A at I:65:20-66:10; Buratti Dec. Exs. Q, R.

186.    LNC maintains a website at www.nuby.com. See <www.nuby.com>(visited May 19, 2009 and on other dates, including June 4, 2009). Buratti Dec. Ex. D.

187.    LNC's website describes the Gripper Cup as having functional features. Buratti Dec. Ex D.

188.    LNC's website states its Gripper Cup is "easy to use." Buratti Dec. Ex. D.

189.    LNC's website states its Gripper Cup is "easy to clean." Buratti Dec. Ex. D.

190.    LNC's website states its Gripper Cup is "perfect for little hands to hold and toddlers on the go." Buratti Dec. Ex. D.

191.    LNC's website states its Gripper Cup "prevents spills." Buratti Dec. Ex. D.

192.    LNC's website states its Gripper Cup "reduces leaks." Buratti Dec. Ex. D.

193.    LNC's website states its Gripper Cup has a "unique 1 piece valve." Buratti Dec. Ex. D.

194.    LNC's customer sheets describe the utilitarian features of the Gripper Cup. Buratti Dec. Ex..J.

**No-Spill Cup**

195.    The No-Spill Cup is sold in a variety of colors. Buratti Dec. Ex. D.

196.    The trademark NUBY® appears on LNC's No-Spill Cup at least one time. Buratti Dec. Ex. D.

197.    Plaintiffs' trade dress chart alleges a protectable element of the No-Spill Cup traded dress is "a colored tinted generally cylindrical cup with a wider portion." Buratti Dec. Exs. Q, R.

198.    Competitors of plaintiffs in the sippy cup market sell sippy cups having a colored tinted generally cylindrical cup with a wider portion. Buratti Dec.  Ex. A at I:81:8-19; Buratti Dec. Ex. G.



199.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  All right, do other competitors that
> we've talked about today, use colored, tinted,
> generally cylindrical shaped cups?
> A.  Yes.
> Q.  Do some of those cups have lighter
> upper portions?
> A.  Yes.
> Q.  Do other competitors that we've
> discussed today use colored caps?
> A.  Yes.
> Q.  Tinted caps?
> A.  Yes.

Buratti Dec. Ex. A, at.I at 81:8-19.

200.    Plaintiffs' trade dress chart alleges a protectable element of the No-Spill Cup trade dress is "a colored or tinted cap, having a cap sitting on a cap look, with a spout having a

bulb-like base and a relatively pointed top." Buratti Dec. Ex. A at I:66:11-67:11; Buratti Dec.

Exs. Q, R.

201.    Competitors of plaintiffs in the sippy cup market sell sippy cups having a colored

or tinted cap, having a cap sitting on a cap look, with a spout having a bulb-like base and a

relatively pointed top. Buratti Dec. Ex. A at I:81:15-82:7; Buratti Dec. Exs. G, Q, R.



202.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q. Do some of them use caps that have a
> cap sitting on a cap look?
> A.  Yes.
> Q.  Do other competitors have cups with
> spouts that have bold [sic] like faces?
> A.  Yes.
> Q.  And pointy tops?
> A.  Yes.
> Q.  Relatively pointed tops?
> A.  Yes.

Buratti Dec. Ex. A at I:81:20-82:7.

203.    Plaintiffs' trade dress chart alleges a protectable element of the No-Spill Cup

trade dress is a "folded inner paper insert." Buratti Dec. Ex. A at I:66:11-67:11; Buratti Dec.

Exs. Q, R.

204.    Competitors of plaintiffs in the sippy cup market sell sippy cups having a folded

inner paper insert. Buratti Dec. Ex. A at I:82:8-10; Buratti Dec. Ex. G.

205.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Do other competitors use packaging

> that's folded and inserted into sippy cups?
> A. Yes.

Buratti Dec. Ex. A at I:82:8-10.

206.    There are no other elements of the No-Spill Cup asserted against Walgreens in

addition to the elements listed in Buratti Dec. Exhibits Q and R.  Ex. A at I:66:11-18.

207.    On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  For the exhibit C product, which is
> depicted on the left side of the second page of
> exhibit 40, are there any other elements besides
> the four - well, for the naked product, the first
> three elements, are there any other naked trade
> dress elements, besides those three bullet
> points, asserted against Walgreens?
> A.  I don't believe so.

Buratti Dec. Ex. A at I:66:11-18.

208.    Plaintiffs' website describes the No-Spill Cup in functional language.  Buratti

Dec. Ex. D.

209.    LNC's website states its No-Spill Cup "features the Dual-flo$^{TM}$ valve that can be

adjusted to control the flow of liquid. The easy to use spout is hard and robust perfect for

toddlers with newly formed sharp teeth." Buratti Dec. Ex. D.

210.    LNC's customer sheets describe the utilitarian features of its cups.  Buratti Dec.

Ex. J.

## Plaintiffs Never Attempted To Register Their Trade Dress, Despite The Admitted Importance Of Obtaining Registrations

211.    LNC has not applied to register the asserted designs as trade dress with the

USPTO. See <www.uspto.gov> (visited June 4, 2009).

212.    On May 21, 2009 LNC's CEO Nouri Ed Hakim testified:

> A.  I would register what I can register.

81

> Q. So, you would register the trade dress,
> if it was up to you, as CEO?
> A. Me, personally, I would register
> whatever I could register, without just a sure
> waste of money.

Buratti Dec. Ex. A at II:173:1-6.

213.    Plaintiffs ignored that they did not attempt to register their trade dress in their

Motion. See generally DE 49.

**Plaintiffs Have No Reliable Advertising Evidence**

214.    Before 2009, LNC had "basically no" advertising budget in the United States.

Buratti Dec. Ex. B at I:31:7-17.

215.    Admar does not advertise in the U.S. at all. Buratti Dec. Ex. B at I:29:6-17.

216.    Plaintiffs testified to have given

Buratti Dec. Ex. B at

I:47:2-8.    REDACTED

217.    Plaintiffs testified, that this        would

Buratti Dec. Ex. B (emphasis

added) at I:47:2-8.

218.    Plaintiffs cannot ascribe the portion of the non-plaintiff advertising done on any

particular product, let alone the asserted products in suit. Buratti Dec. Ex B at II:16:6-13.

219.    Plaintiffs' advertisements discuss function  attributes of their product designs.

Buratti Dec. Ex. A at II:111:16-17.

220.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q. What advertising are you aware of that
> promotes the functional attributes of the gripper
> cup?
> A. Specifically, only promotes the

82

function attributes?
Q. No, no, I'm not separating, but I
understand it may do both, but my first question
promotes functional attributes?
A. That may include some functionality?
Q. Sure.
A. All of the advertisement probably
includes some form of functionality.

Buratti Dec. Ex. A at II:111:12-17.

221. On May 29, 2009, LNC's President Joseph Hakim testified:

Q. There's a lot of different costs here in
Exhibits 55 and 56. Are they apportionable to a
8 byproduct basis?
A How?
Q Can I -- can I apportion these costs --
A To a specific item?
Q Yes.
A No.

Buratti Dec. Ex B at II:16:6-13.

222. Plaintiffs ignored that they have no reliable advertising evidence in their Motion.

See generally DE 49.

**Plaintiffs Have No Survey Evidence**

223. Plaintiffs have not conducted any consumer survey of their own with regard to the

Gripper Cup. Buratti Dec. Ex. A at I:56:13-20.

224. Plaintiffs have not conducted any consumer survey of their own with regard to the

No-Spill Cup. Buratti Dec. Ex. A at I:56:13-20.

225. Plaintiffs have not conducted any consumer survey of their own with regard to the

Comb/Brush Set. Buratti Dec. Ex. A at I:56:13-20.

226. When ask why they never conducted a survey, LNC's CEO testified "why should

we? We're the market leader....there is no reason to." Buratti Dec. Ex. A at I:56:21-57:6.

227.   On May 20, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q. But my question was, why didn't Luv 'N
> Care ever do a survey regarding, for example,
> secondary meaning?
> A.  Didn't need to.
> Q.  For what?
> A.  Didn't need to.  It's a simple case.

Buratti Dec. Ex. A at I:57:22-58:3.

228.   Plaintiffs ignored that they never took a survey in their Motion.  See generally DE

49.

## Plaintiffs Have No Evidence Of Unsolicited Media Coverage

229.   Plaintiffs testified there has been no unsolicited media coverage that highlights

the look of the Gripper Cup.  Buratti Dec. Ex. A at III:151:10-13.

230.   Plaintiffs testified that they were "not sure" whether there had been any

unsolicited media coverage with respect to the No-Spill Cup.  Buratti Dec. Ex. A at III: 151:14-

20.

231.   Plaintiffs testified that there are 200,000 blogs related to their products sold under

their NUBY® trademark that they found on a Google® search.  Buratti Dec. Ex. B at II:20:20-

22:4.

232.   Plaintiffs ignored in their Motion that they could not specify any unsolicited

media coverage during discovery or depositions.  See generally DE 49.

## Plaintiffs' Patents Describe All Of The Alleged Trade Dress Features Of The Gripper Cup And The No-Spill Cup

233.   Plaintiffs ignored their own patents in their Motion.  See generally DE 49.

234.   At least four patents describe and depict features of the No-Spill and Gripper

Cups, including the "overall look" of these asserted product designs.  Buratti Dec. Ex. A at

84

II:183:10-16 (No- Spill Cup); Buratti Dec. Ex. A at II:186:6-16 (Gripper Cup); Buratti Dec. Exs. K-N.

235.    LNC's CEO, Nouri Edward Hakim is listed as a named inventor on U.S. Patent Nos. 7,243,814, 6,357,620, 6,321,931, and 6,994,225. Buratti Dec. Ex. A at II:194:11-20; Buratti Dec. Exs. K-N.

236.    The patents from Paragraph 100 are assigned to Admar International, Inc. (Admar). Buratti Dec. Ex. A at II:194:11-20.

237.    Plaintiffs testified that their patents "spea[k] for themselves" Buratti Dec. Ex. A at II:144:7-21.

238.    Alleged inventor N.E. Hakim testified that the Figure 10(B) of U.S. Patent Number 6,994,225 illustrates the asserted product design of the Gripper Cup. Buratti Dec. Ex. A at II:186:6-16.

239.    On May 21, 2009 LNC's CEO, Nouri Edward Hakim Testified:

> Q.  Does figure ten depict Luv 'N Care's no
> spill gripper cup that's asserted against
> Walgreens?  Sorry, figure ten.
> A.  The outside shape, yes.
> Q.  Side shape?
> A.  The outside shape, yes.
> Q.  The outside shape.
> A.  For all these.
> Q.  An overhead view?
> A.  The outside shape.  The physical shape
> of the spout and the cup, yes.

Buratti Dec. Ex. A at II:186:6-16.

240.    This Figure shows Fig. 10(B) from U.S. Patent No. 6,994,225 (left) and plaintiffs' Gripper Cup from Exhibit B from the Complaint (right).

| FIG. 10(B) from U.S. Pat. No. 6,994,225 | Plaintiffs' Gripper Cup |
|---|---|
|  | |

241.    The 6,994,225 patent discloses, "The embodiments of the drinking products with a nipple are, of course, provided for use by babies…The spout is preferably a soft spout which is part of a soft lid, e.g. a lid and spout made of silicone." Buratti Dec. Ex. N, '225 Patent at Col. 5, ln. 28-34.

242.    The 6,994,225 patent discloses "A gripping area for use to hold the cup more securely…this grip area can be in the form of a series of contours in the cup." Buratti Dec. Ex. N, '225 Patent at Col. 20, ln. 22-25.

243.    The 6,994,225 patent discloses "The nipple can be constructed out of any of the flexible materials currently used in the art of baby bottle nipple construction, or any other suitable flexible materials for use in such a nipple. Such materials are preferably soft, elastic, and made of a material which is harmless to the user." Buratti Dec. Ex. N, '225 Patent at Col. 6, ln. 11-16.

244.    Alleged inventor Hakim testified that the Figure 5 of U.S. Patent Number 7,243,814, illustrates the asserted No-Spill Cup product. Buratti Dec. Ex. A at II:140: 6-15.

245.    On May 21, 2009 LNC's CEO, Nouri Edward Hakim Testified:

> Q.  Take a look now at figure five -
> A.  Okay.
> Q.  - in the 814 patent that is exhibit 42.

86

A.  Okay.
Q.  That appears to look more like exhibit
36.
A.  Yes.
Q.  And is it, in fact, a graphical
representation of the product that's exhibit 36?
A.  That's correct.

Buratti Dec. Ex. A at II:140: 6-15.

246.    This Figure shows Fig. 5(a) from U.S. Patent No. 7,243,814 (left) and plaintiffs'

No-Spill Cup from Exhibit C from the Complaint (right).

**U.S. Pat. No. 7,243,814**
**FIG. 5(a)**

**Plaintiffs' No- Spill**
**Cup (DE 1 Ex. C)**



247.    U.S. Pat. No. 7,243,814 ("the '814 patent") claims, "an apparatus as claimed in

claim 1, wherein said apparatus comprises a cap for a cup, said cap comprising a soft spout."

Buratti Dec. Ex. K, '814 Patent, Claim 14.

248.    The '814 patent claims "an apparatus according to claim 23, comprising a cup,

and wherein said cap is further provided with finger grips on the outside of said cap to facilitate

screwing of said cap on and off of said cup." Buratti Dec. Ex. K, '814 Patent, Claim 34.

249.    LNC has two issued design patents related to sippy cups.  See Barten MSJ Opp.

Dec. Ex. 7, 8.

250.    No LNC design patent on a sippy cup covers a design asserted against Walgreens.

Compare Exs. A and B with DE. 1 at Exs. B, C.

**Plaintiffs Unreliable Sales Information Cannot Be Attributed To The Trade Dress Of Plaintiffs' Products**

251.    Plaintiffs' sales data does not identify what portion of sales is attributable to

product design. Buratti Decl. ¶¶ 23-25.

252.    Before May 20, 2009, plaintiffs' provided only total sales by Wal-Mart of non-

specific products, which are not pertinent to Walgreens.  Buratti Decl. ¶¶ 23-25.

253.    On May 20, 2009 , LNC's President Joseph Hakim testified:

> Q.  And as a general proposition, what kind
> of products are in the later stack, that is not
> relevant?
> A.  That is not relevant?  Can I look at
> them?
> Q.  You can.
> A.  Okay, types of things are, like, the
> Wal-Mart sales, which I don't think is pertinent
> to Walgreens . . . .

Buratti Dec. Ex. B at I:18:16-19:2.

254.    Plaintiffs are aware that a portion of their sales of the Gripper Cup is attributable

to their patents. Buratti Dec. Ex. A at II:61:7-15.

255.    On May 21, 2009. LNC's CEO Nouri Ed Hakim testified:



Buratti Dec. Ex. A at II:61:7-15.

256.    Plaintiffs have no knowledge as to what portion of their sales of the Gripper Cup is attributable to their patents. Buratti Dec. Buratti Dec. Ex. A at II:60:13-61:3.

257.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

REDACTED

Buratti Dec. Ex. A at II:60:13-61:3.

258.    Plaintiffs have no knowledge as to what portion of their sales of the Gripper Cup is attributable to their copyrights. Buratti Dec. Ex. A at II:87:9-12.

259.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

REDACTED

Buratti Dec. Ex. A at II:87:9-12.

260.    Plaintiffs have no knowledge as to what portion of their sales of the Gripper Cup is attributable to its silicone spout. Buratti Dec. Ex. A at II:71:4-7.

261.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

REDACTED

Buratti Dec. Ex. A at II:71:4-7.

    262.    Plaintiffs have no knowledge as to what portion of their sales of the Gripper Cup is attributable to the fact that it fits easily into a small baby's hands. Ex. A at II:71:8-11.

    263.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

<div style="text-align:center; font-size:2em;">REDACTED</div>

Buratti Dec. Ex. A at II:71:8-11.

    264.    Plaintiffs have no knowledge as to what portion of their sales of the Gripper Cup is attributable to the fact that it is made from substantially break resistant plastic.  Buratti Dec. Ex. A at II:71:12-16.

    265.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

<div style="text-align:center; font-size:2em;">REDACTED</div>

Buratti Dec. Ex. A at II:71:12-16.

    266.    Plaintiffs have no knowledge as to what portion of their sales of the Gripper Cup is attributable to their NUBY® trademark. Buratti Dec. Ex. A at II:74:15-76:1.

    267.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

<div style="text-align:center; font-size:2em;">REDACTED</div>

# REDACTED

Buratti Dec. Ex. A at II:74:15-76:1.

268.    Plaintiffs have no knowledge as to what portion of their sales of the No-Spill Cup

is attributable to their NUBY® trademark. Buratti Dec. Ex. A. at II:119:9-120:1.

269.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Do you know what portion of the sales
> of the hard tipped sippy cup, that's asserted in
> this case, are attributable to the Nuby trademark
> that appears on the body of the cup?
> A.  I would say a fair percentage.
> Q.  More than half?
> A.  Can't pin it down to a half.  I know
> the Nuby name is a trusted name, so it's going to
> stop the consumer, and then what's in their head,
> why they buy it, I think they buy it because they
> trust the brand.  They assume the brand is going
> to work, or they wouldn't buy it to begin with.
> So, they're buying it for the aesthetic look of
> it, because they trust it's going to work.  It's
> made by Nuby.

Buratti Dec. Ex. A. at II:119:9-120:1.

270.    Plaintiffs have no knowledge as to what portion of their sales of the No-Spill Cup

is attributable to their patents. Buratti Dec. Ex. A. at II:124:15-19.

271.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Do you know what portion of the sales
> are attributable to the patent protection over
> the exhibit C to the complaint product that's in

91

> exhibit 36?
> A.  Six?  Do not.

Buratti Dec. Ex. A. at II:124:15-19.

272.    Plaintiffs have no knowledge as to what portion of their sales of the No-Spill Cup

is attributable to its dual flow feature. Buratti Dec. Ex. A at II:122:20-123:1.

273.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  You don't know what portion of the
> sales of the hard tipped no spill cup are
> attributable to the dual flow feature?
> A.  I do not.

Buratti Dec. Ex. A at II:122:20-123:1.

274.    Plaintiffs have no knowledge as to what portion of their sales of the No-Spill Cup

is attributable to its reversible valve. Buratti Dec. Buratti Dec. Ex. A at II:123:11-13.

275.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Do you know what portion of the sales
> are attributable to that valve being reversible?
> A.  No, I do not.

Buratti Dec. Ex. A at II:123:11-13.

276.    Plaintiffs have no knowledge as to what portion of their sales of the No-Spill Cup

is attributable to its no-spill feature.  Buratti Dec. Ex. A at II:123:2-4.

277.    On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Do you know what portion of the sales
> are attributable to the no spill feature?
> A.  I do not.

Buratti Dec. Ex. A at II:123:2-4.

278.    Plaintiffs have no knowledge as to what portion of their sales of the Comb/Brush

Set is attributable to its NUBY® trademark. Buratti Dec. Ex. A at II:219:2-5.

279.   On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Do you know what portion of the sales
> of this product that's exhibit 46 is attributable
> to the trademark Nuby on the product?
> A.  No, I don't.

Buratti Dec. Ex. A at II:219:2-5.

280.   Plaintiffs have no knowledge as to what portion of their sales of the Comb/Brush

Set is attributable to the fact that this product is marketed as soft and gentle on a baby's scalp.

Buratti Dec. Ex. A at II:219:12-15.

281.   On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  Do you know what portion of the sales
> are attributable to the fact that this product is
> marketed as soft and gentle on a baby's scalp?
> A.  No, I do not.

Buratti Dec. Ex. A at II:219:12-15.

282.   Plaintiffs have no knowledge as to what portion of their sales of the Comb/Brush

Set is attributable to the soft-grip handle. Buratti Dec. Ex. A at II:219:19-22.

283.   On May 21, 2009, LNC's CEO Nouri Ed Hakim testified:

> Q.  [D] you know what portion of
> the sales are attributable to the soft grip
> handle?
> A.  No, I don't.

Buratti Dec. Ex. A at II:219:19-22.

284.   Plaintiffs produced sales data that does not indicate what portion of the sales was

due to initial or repeat customers. Buratti Dec. Ex. B at II:7:12-8:17.

285.   On May 29, 2009, LNC's President Joseph Hakim testified:

> Q.  I'm going to hand you exhibits labeled
> Hakim 10, 11 and 13 that are part of Defendants'
> Exhibit 30 in this case.  My questions probably can

be answered generally, so I'm going to ask that
first and see if you can answer generally.
A.   Okay.
Q.   Can you identify in exhibits Hakim 10, 11
or 13 what sales are repeat sales?
A.   Which sales are repeat sales?
Q.   Yes.
A.   Talking about at a consumer level?
Q.   Yes.
A   No.
Q.   Does Luv N' Care have any information that
would show an initial versus a repeat sale for an
easy grip, hard and soft comb and brush?
A.   These documents as you see them cannot
give whether or not a consumer is buying a
repetitive product or not.
Q.   Can the McQuillan database generate such a
report?
A.  No, because the consumer doesn't buy
directly from Luv N' Care.
Q.   So then Luv N' Care has no -- no
information itself about what it -- what percentage
of the asserted products are sold in the initial
versus the repeat stage?
A. Not from reports.

Buratti Dec. Ex. B at II:7:12-8:17.

286.   Plaintiffs' sales numbers do not indicate what portion of the sales is attributable to

the plaintiffs' common-law trademarks.  Buratti Dec. Ex. A at II:120:15-121:9.

287.   On May 20, 2009 LNC's CEO Edward Hakim testified:

Q.  All right, are those sales - what
portion of those sales are attributable to the no
spill trademark?  I'm just showing you also, in
conjunction with these questions, defendant's
exhibit eight.
A.  The no spill trademark is not shown on
this cup.
Q.  Its shown on the advertising materials.
This is an excerpt from the web site - from Luv
'N Care's web site.
A.  Oh, do I know what sales of this cup -
the success, or what percentage of the sales are

94

because of this web site page?
Q.  Are because the product is marketed in
connection with a no spill, with a little TM,
which indicates a common law trademark.
A.  Well, I don't know that.

Buratti Dec. Ex. A at II:120:15-121:9.

288.    Plaintiffs ignore in their motion that they cannot attribute any sales data to their

asserted trade dress.  See generally DE 49.


Dated:  June 28, 2009

Respectfully submitted,
 s/Jason R. Buratti
Alan M. Weisberg, Esq. (No. AW9062)
Jeffrey H. Kamenetsky (Pro Hac Vice)
Jason R. Buratti (Pro Hac Vice)
Garrett A. Barten (Pro Hac Vice)
CHRISTOPHER & WEISBERG, P.A.
200 East Las Olas Boulevard, Suite 2040
Fort Lauderdale, Florida 33301
Telephone: (954) 828-1488
Facsimile: (954) 828-9122
aweisberg@cwiplaw.com

Bennette D. Kramer
SCHLAM STONE & DOLAN LLP
26 Broadway, Suite 19
New York, NY 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
bdk@schlamstone.com


# REDACTED


*Attorneys for Defendant WALGREEN CO.*