## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 08-CIV-4457 (DC/HP)

LUV N' CARE, LTD., and
ADMAR INTERNATIONAL, INC.,

       Plaintiffs,

vs.

WALGREEN CO., and
KMART CORP.
       Defendants.

_____/

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Luv n' care, Ltd. ("Luv n' care") and Admar International, Inc. ("Admar") (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to the Motion for Summary Judgment filed by Defendant Walgreen Co. ("Walgreen").

Plaintiffs also request oral argument, where the Court will be able to view, in person, the cups and packaging at issue, the alternatives in the market, and Walgreen's knockoff cups and product packaging. It is submitted that this opportunity to directly view that evidence will significantly assist the Court in its adjudication of this matter.

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................ 1

     A.   Walgreen's Motion is a Non-Starter ............................................. 1

     B.   Walgreen's Motion Improperly Challenges the Weight of the Evidence ..... 3

     C.   Royal King Agreed to Pay Plaintiffs $500,000 Plus 12% Royalties on
          Past Sales and a Permanent Cease and Desist Order .................... 3

     D.   Under Rule 56(f) Walgreen's Motion Should Be Denied or Continued ....... 4

II.   WALGREEN'S MOTION IMPROPERLY CHALLENGES THE WEIGHT OF
      THE EVIDENCE AND RELIES ON DISPUTED FACTS ..................................... 4

III.  PLAINTIFFS' FEDERAL CLAIMS ARE WELL GROUNDED .......................... 9

     A.   Plaintiffs' Product Design Trade Dress Has Secondary Meaning ............... 9

     B.   Walgreen's Discussion of the Applicable Legal Standards is Misleading .. 13

     C.   Plaintiffs' Trade Dress is Primarily Non-Functional ................................. 15

          1.   The Definition of Legal Functionality is not Based on
               Whether a Feature has a "Function" ................................................ 15

          2.   Functionality is Determined on the Basis of the Whole,
               not its Parts ...................................................................................... 16

          3.   Walgreen's "Evidence" Does Not Demonstrate Non-
               Functionality ...................................................................................... 17

          4.   Many Courts Have Found Liquid Containers are Non-
               Functional .......................................................................................... 19

          5.   The Impact of Utility Patents on the Evaluation of
               Functionality ...................................................................................... 20

          6.   The USPTO Does Not Consider the Trade Dress to Be
               Functional .......................................................................................... 22

III.  BECAUSE WALGREEN'S HAS NOT PRODUCED DISCOVERY AND
      FULLFILLED ITS RULE 30(b)(6) OBLIGATIONS, WALGREEN'S MOTION
      SHOULD BE DENIED OR CONTINUED .......................................................... 22

CONCLUSION .............................................................................................. 25

## MEMORANDUM OF LAW

### I.    INTRODUCTION

Defendant Walgreen's motion under the Lanham Act is based on inherently factual contentions, which it uses to wrongly allege that that the products at issue are "not legally protectable" as "trade dress."  Defendant's Memorandum of Law ("DM") at 1.[1]

Furthermore, Walgreen wrongly claims that "all of Plaintiffs' claims require protectable trade dress . . . ."  (DM 3; *id.* 1, 12)  This is untrue.  New York law clearly provides that proof of secondary meaning is not required on an unfair competition or deceptive business practices claim.  Proof that the overall product look is primarily non-functional is also not required when the defendant knowingly sells a knockoff in a manner that is unfair or deceptive.[2]

Walgreen papers demonstrate the factual nature of its motion.  Although it claims its motion is based on *Celotex*, its arguments go to the weight of the evidence, not an absence of evidence, which becomes obvious when the facts and the controlling case law are reviewed.

### A.  Walgreen's Motion is a Non-Starter

Apart from not reaching Plaintiffs' claims under New York law, or reaching any of the packaging claims, Walgreen's motion does not even address the most obvious facts pertaining to the Lanham Act claims.  For example, its Rule 56.1 Statement omits any reference to the most glaring fact:  that Walgreen deliberately copied the look of Luv n' care's best-selling cups.  *See* Additional Material Fact ("AMF") 105 in Plaintiffs' Response to Defendant's Separate Statement and Additional Material Facts in Dispute.[3]

---

[1]    Walgreen did not move on Plaintiffs' claims on its specially designed 2-pack packaging for the soft-spout cup, and its argument (DM at 3, n.1) that packaging claims were not brought is specious.  Plaintiffs' Complaint (including ¶¶ 2, 13-19, 22-28, and 57-114) expressly alleges that "Defendants" Kmart and Walgreen use infringing packaging. *E.g.,* Complaint a ¶ 83 Docket Entry ("DE") 1 ("Defendants are intentionally using Plaintiffs'. . . packaging to trade off of Plaintiffs' reputation and goodwill and to create deception in the marketplace.").  Indeed, Walgreen responded to Plaintiffs' trade-dress packaging claims in its Answer.  *See* Walgreen's Answer, DE 12 at ¶¶ 2, 13-19, 22-28, 57-114, Sixth Aff. Defense (alleging the packaging trade dress is functional); Fifth Aff. Defense (alleging the packaging trade dress is not famous).

[2]    Plaintiffs have moved for partial summary judgment under New York law.  *See* Pltfs' Memo. in Support of Mot. for Partial Summ ("PM") DE 49.  At a minimum, Walgreen's engaged in a "bad faith" attempt to palm off its knockoff cups as Luv n' care's two best-selling cups, and its unfair and deceptive bait-and-switch scheme, which *actually confused* consumers, as evidenced by the Affidavit of Brandy Thomas.  *See* Exhibit ("Ex.") 5 to Decl. of N. Edward Hakim, DE 52.

[3]    The number of different shapes, designs, styles and colors of sippy cups available in the market will be readily apparent at oral argument.  There, the Court will be able to view the cups in question and their alternatives as they actually appear to consumers in person, rather than

1

It is not by random chance that Walgreen's cups are virtually in appearance to two best-selling cups in the U.S.  Despite all the shapes, designs, styles and colors available to the creative mind, Walgreen commissioned look-a-like copies of Luv n' care's products.  (AMF 105)  Federal law is clear that such intentional copying alone is evidence of protectable trade dress.

Another notable omission is the absence of any reference to the relevant history. Walgreen wanted to sell its hard-spout and soft-spout cups as "WOW" items *because* Luv n' care's products had *already* become America's best selling cups.  (AMF 58, 68, 81).  Walgreen wanted to have those cups and to promote them as "WOW" items because of known special appeal to consumers.  (AMF 82)

Before Walgreen sold Luv n' care's cups, Walgreen's best cup was selling only 25,000 to 35,000 units *per year*.  (AMF 84)  But after it bought Luv n' care's hard-spout cup, it began selling 23,000 units in an average, *non*-promotional ***week*** (and 85,000 units during an average promotional week).  (AMF 59)  Eventually, after Walgreen picked up Luv n' care's soft-spout cup (which Walgreens wanted to promote in a special 2-pack designed by Luv n' care), Walgreen sold 2 million Luv n' care cups in 2005 and nearly 3 million in 2006.  (AMF 86)  Luv n' care's cups were perfect "WOW" items: quality products having special appeal with consumers, where consumers would naturally think, "Wow, those are the products I want, at a good price too."  (AMF 58, 68)  Plaintiffs have moved for summary judgment because Walgreen's request to make America's two best-selling cups and subsequent copying is nothing less than an admission by it that Luv n' care's cups have unique appeal to consumers, who know those cups by the way they look.  (AMF 72)

Walgreen also omits any reference to why it ditched America's two best selling cups shortly after deceiving Luv n' care into providing an enormous amount of inventory in levels that Walgreen had never carried before (AMF 89-91), because that, too, is nothing less than an admission of liability.  Walgreen told Luv n' care that it needed to find an "alternative source" for its "WOW" promotional cups due to a price increase it had agreed to but later reneged upon. (AMF 95).  But not just any cup would do for Walgreen.  Walgreen did not look to copy Gerber, Avent, Playtex, Even Flo or any other brand.  Nor did it come up with a creative design of its own.  It just had to have cups that looked like Luv n' care's.

---

Walgreen's small, distorted and unreliable pictures of portions of cups, and grouping of cups that look completely different in person.  (AMF 151)

Walgreen's buyer, who secured an "alternative source" for the "WOW" cups (AMF 97), who personally approved the look of the knockoffs (AMF 98) and who came up with a name for them (AMF 99), knew that his cups had to look like Luv n' care cups. That's what consumers wanted. That's what they were buying. (AMF 106) He could not risk a huge drop in sales.

So, Walgreen devised a scheme to obtain an enormous amount of inventory from Luv n' care – inventory it could never have obtained if Luv n' care had known what Walgreen was up to: namely, commissioning knockoffs from Royal King, a known intellectual pirate. (AMF 96) Once Walgreen obtained the knockoffs, it sold them in Luv n' care's shelf-space, and comingled them with authentic Luv n' care's cups, under signs identifying them all as coming from Luv n' care, so as to deliberately confuse consumers into thinking the knockoffs and originals were both products from the same Luv n' care source.[4] (AMF 103-04)

Walgreen's motion addresses none of these facts. It is a non-starter. It should be denied as a complete waste of the Court's time.

### B. Walgreen Improperly Challenges the Weight of the Evidence

Like the Wizard of Oz, Walgreen hopes no one will not pull back the curtain and see what it has been up to. For all its smoke and mirrors, Walgreen's motion relies on six bullet points, *all* of which are disputed, and *none* of which provide a basis to take this case from the jury, let alone summarily adjudicate the two factual issues Walgreen has raised. *See, infra at* II.

### C. Royal King Agreed to Pay Plaintiffs $500,000 Plus 12% Royalties on Past Sales and a Permanent Cease and Desist Order

Indeed, rather than sit for a court-ordered deposition in the Texas litigation, Royal King, the Thailand pirate who made the infringing products, settled. It agreed to pay Plaintiffs approximately $900,000, including a 12% royalty on past sales of its infringing products, which include the very products here that Walgreen alleges are not protectable. (AMF 140) Royal King also agreed to permanently cease and desist manufacturing the cups and any confusingly

---

[4]    Other notable omissions and misstatements in Walgreen's motion include: (1) Walgreen's mischaracterization of the large amount of cooperative and, in many cases, entirely free advertising of Luv n' care's sippy cups done by Walgreen, Wal-mart and other large retail stores, which featured images of Luv n' care's cups and were extremely effective (AMF 59,66,74); (2) Walgreen's mischaracterization of the record, which plainly includes a substantial amount of unsolicited media coverage for Plaintiffs' soft-spout cup (AMF 78-80); and (3) the number of awards Luv n' care's soft-spout cup received (AMF 75-6) These facts not only show that Luv n' care's soft-spout cup has secondary meaning, but also that it is famous and therefore entitled to protection against dilution by Walgreen's knockoff.

similar ones.  (AMF 140)  It also admitted something that Walgreen's buyer refused to recall: *that Walgreen approached Royal King to knockoff Luv n' care's two best-selling cups!*  (AMF 141)  Walgreen <u>directed</u> Royal King to copy the look of Luv n' care's products.  (AMF 147)

Royal King's settlement utterly discredits Walgreen's arguments.  It also conveys a plain and simple message:  The quickest way for this case to end is for the Court to require Walgreen to provide discovery and fulfill its Rule 30(b)(6) obligations, and to join Atico by transferring this case to Florida where Atico already filed suit and/or recognizing it as an indispensable party.

### D.  Under Rule 56(f) Walgreen's Motion Should Be Denied or Continued

Finally, Walgreen's motion should be denied or continued pursuant to Rule 56(f) of the Federal Rules.  Presently, Plaintiffs are proceeding to trial and having to oppose this motion with virtually none of the relevant discovery needed in response to Plaintiffs' timely document requests, interrogatories and requests for admission.   (AMF 123,125).   Likewise, after stonewalling on those requests and refusing to disclose Atico as required by law, Walgreen then stonewalled at deposition.  In contrast, Plaintiffs provided Walgreen with over 200,000 pages of Plaintiffs' discovery and the full opportunity to deposed Plaintiffs' key personnel.

Plaintiffs are entitled to first obtain Walgreen's documents and responses to interrogatories and to finish Walgreen's deposition before Walgreen's motion is considered. Neither due process nor the Federal Rules of Civil Procedure contemplate or permit a decision on the merits under *Celotex* without discovery.   Because Plaintiffs' written discovery and document requests were timely when issued, because Walgreen has acknowledged that it needs to sit for its deposition and fulfill its obligations, and because Walgreen knowingly violated Rule 26 by hiding Atico's identity, Walgreen's motion must be denied or continued.

## II.    WALGREEN'S IMPROPERLY CHALLENGES THE WEIGHT OF THE EVIDENCE AND RELIES ON DISPUTED FACTS

Walgreen's motion relies on six bullet points, *all* of which are disputed, and *none* of which provide a basis to take this case from the jury, let alone summarily adjudicate the two factual issues Walgreen has raised.

For example, Walgreen "questions" Luv n' care's sales evidence, which is one of the well recognized factors of secondary meaning.  (*See* DM 1)  Yet, Walgreen does not tell the Court that it chose to buy and resell Luv n' care's cups *because they were already the best-selling cups in America.*  (AMF 58,68,81)  Also, Luv n' care did not just have "success" selling cups; Luv n'

4

care outsold the target market, new mothers, *by more than 4 to 1*, dominating the market. (AMF 71) Even without more, the sales invoices and spreadsheets timely produced in this case alone show that parents nationwide purchased Luv n' care cups at an astounding rate. *Over 94 million cups were sold in 5 years -- including over 37 million cups in the first 2 years, during a period when only about 8 million babies were born*.[5] (AMF 70)

Walgreen resorts to arguing that the "popularity" of the Luv n' care cups, which it does not dispute (DM at 2), does not matter – basically alleging the jury cannot infer that mothers know the two best selling cups in America by their looks from the evidence of the sales numbers and popularity. (DM at 8, 14) Walgreen's argument is not credible. Perhaps, the only thing a mother holds more than her child *is her child's cups*, which she refills five-ten times a day, which she routinely picks up off the floor, which she notices other mothers using, and which she goes out and purchases for her child. (AMF 14)

A signature of a Luv n' care cup is the way its looks. (AMF 9,16) Luv n' care cups are designed to convey a commercial impression to consumers, separate from any words or packaging, including the embedded, discretely placed NUBY® trademark. (AMF 17) In fact, an embedded, discretely placed trademark on a cup helps consumers associate the look of those cups with a single source. (AMF 18) Consumers initially buy and repurchase Luv n' care cups because of the way they look: the look of Luv n' care cups is important, both in terms of consumer awareness and brand loyalty. (AMF 12)

Walgreen's second bullet point is the inference it attempts to draw from Luv n' care's decision not to spend upwards to $100,000 on consumer surveys to show something that it cannot reasonably dispute under the unique circumstances of this case. Walgreen approached Luv n' care to make Luv n' care's already best-selling cups as "WOW" items because both

---

[5]   To confuse and deceive, Walgreen argues that Plaintiffs timely produced sales figures that only relate to Walmart, and that the figures "are not pertinent to Walgreens." (DM at 8) Both statements are false. Plaintiffs timely produced sales invoices and spreadsheets including sales from all its customers, including, Walmart, Kmart, Target, Toy R' Us and Walgreen. (AMF 117-19) Also, Walmart sales, particularly those pre-dating Walgreen, are directly relevant to secondary meaning and Walgreen's bad faith bait-and-switch. They evidence *why* Walgreen had to have Luv n' care's cups in the first instance, and *why* Walgreen could not deviate from the look of Luv n' care's cups when it sought an "alternative source" for its "WOW" promotion. Walgreen's largest competitor was literally selling tons of Luv n' care cups. (AMF 63,106) Walgreen purposefully mischaracterizes deposition testimony in an effort to obfuscate this extremely harmful fact, which undermines its motion. (*Compare* AMF 63,106 *with* SUF 136).

5

Luv n' care cups already had secondary meaning, *i.e., consumers recognized and were aware of the Luv n' care cups, and associated the the appearance of these cups with a single source, namely, "NUBY" or Luv n' care.*  For the same reason, Walgreen copied that look, and for the same reason, Walgreen falsely promote the knockoffs as being Luv n' care items.  Thus, there is no basis for the negative inference Walgreen's attempts to draw.  In fact, one reason Plaintiffs did not pay for survey evidence is because Royal King did, and its survey showed that Luv n' care's hard-spout cup has acquired distinctiveness.  (AMF 142,148)

Whether due to advertising (a factor mentioned by Walgreen but one that did not make its bullet points, as it weighs in Plaintiffs' favor), the enormous initial sales of the Luv n' care hard-spout cup (12 million in two years), or its consistent sales over time (30 million in five years), Royal King's own survey evidence showed that over 30% of mothers with young children knew that Luv n' care's hard-spout cup came from one source *just by looking at the cup*, even in those locations where Luv n' care sells fewer cups.  (AMF 149-50)   Royal King's number is particularly strong given that Royal King conducted its consumer survey in high-end malls, which normally do not have stores that sell sippy cups, and in locations that did <u>not</u> include nine of the top 10 markets where Luv n' care sells most of its cups (Royal King focused on States where Luv n' care has less of a presence). (AMF 149).   Yet, even in those lesser markets, a substantial number of consumers knew Luv n' care's cup came from a single source.  (AMF 150)

Given that Luv n' care's soft-spout cup, for which a design patent is pending: is even more distinctive than its hard-spout cup; is the #1 selling cup in America; has been the subject of unsolicited media coverage; and has received awards; there was no reason for Plaintiffs to duplicate Royal King's survey and spend money on additional surveys.  (AMF 144)  Rather, Plaintiffs were prudent and retained an expert to provide a report based on Royal King's survey data, among other things.  (AMF 144)  Plaintiffs' expert report was produced in this case and timely provided to Walgreen.  (AMF 129)  Whether the Court reconsiders its *ad hoc* ruling wherein it disallowed Plaintiffs' expert testimony without the benefit of a motion (a procedure which respectfully is inconsistent with due process and the Federal Rules of Civil Procedure, when Luv n' care timely disclosed its expert and produced his report in response to Walgreen's amended initial disclosures), is currently of no moment.  The report rebuts Walgreen's effort to obtain a negative inference as to Plaintiffs' state of mind and purported inaction.

Walgreen's third bullet point pertaining to secondary meaning is not evidence at all but, rather, just argument of counsel.  Walgreen comments that Plaintiffs did not file with the USPTO for trade-dress protection, and attempts to parlay that into a finding of no secondary meaning. (DM at 2)  That would be reversible error.  By law, trade dress does not require federal registration.  Furthermore, Plaintiffs *are* seeking protection from the USPTO for its soft-spout cup (and will likely seek protection for its hard spout cup as well).  Because the trade dress of the soft spout cup is inherently distinctive, a design patent was filed and is pending (AMF 44), and will likely issue before trial.   Likewise, with respect to the hard-spout cup, Walgreen jumps the gun.  The fact that Walgreen knocked off that cup two years after it hit the market and became Walgreen's best selling cup, but before Luv n' care filed for protection, is irrelevant.  Once Walgreens knocked it off, which itself is evidence of secondary meaning, Plaintiffs had a choice to seek federal protection from the USPTO or a district court.  Plaintiffs' very common and perfectly reasonable choice is not evidence, but Walgreen's reliance on this red-herring is telling.

Walgreen's last three bullet points relate to whether the overall look of Luv n' care's cups (including their chosen shape, design and style) is primarily non-functional.  Here, the law and the record plainly support a finding of non-functionality.  To begin with, the USPTO patent examiner reviewing Plaintiffs' design patent never once raised an issue of functionality with respect to the soft-spout cup, even though the USPTO already issued utility patents on that cup. (AMF 45)  This is not surprising because the USPTO routinely issues design patents for the look of sippy cups, even for cups where a utility patent might protect one or more features.  (AMF 8).

Furthermore, federal law is clear that alternative shapes, designs, styles and colors of competitive products on the market are evidence of non-functionality.  In their briefs and exhibits, both Plaintiffs and Walgreens have submitted evidence of numerous alternative cup shapes, designs, styles and colors on the market.  It is the jury's role to decide whether they believe the testimony of Plaintiffs' witnesses or Walgreen's attorneys on whether it was essential for Walgreens to copy the look of Luv n' care's cups. It certainly was not a cost issue:  Plaintiffs' cup shapes, design, styles and colors are more expensive to manufacture.  (ATM 19)

Instead of addressing the merits of Plaintiffs' non-functionality position, Walgreen tries to steer this Court in a way plainly inconsistent with controlling authority.  For example, Walgreen resorts to the utterly discredited tactic of breaking Plaintiffs' trade dress down into

individual, "unprotectable elements" (DM at 2), when federal law is clear that a distinctive underline_combination_underline of common and entirely functional features can obtain trade-dress protection.

Next, Walgreen lies and distorts the record when it claims that "Plaintiffs admit that numerous competitors use each and every allegedly protectable feature of Plaintiffs' alleged sippy cup design trade dress." (DM at 2) There is *no* such admission anywhere. Plaintiffs denied that any competitive cups look like Luv n' care's cups, other than the knockoffs. (AMF 145) Plaintiffs also denied that there were competitors (other than Royal King and Munchkin) that were even using *some* of the specific features found in Luv n' care's cups.[6] (AMF 146)

Walgreen's last bullet point is possibly Walgreen's biggest reach. Walgreen knowingly misstates the law concerning the relevance of utility patents in a trade dress case. A utility patent is relevant only if the central aspect of the patent (*i.e.,* its major claims, not some description or subordinate claim) makes up the main thing consumers perceive when they look at a product. Here, the central aspect of the utility patents at issue concern the *internal components* of Luv n' care's cups – the valves that make them spill proof. The valves do not affect the overall look of the cups. (AMF 21) The utility patents are another red-herring. Walgreen is trying to obfuscate, underline_not_underline address the merits.

Additionally, as set forth at length in Plaintiffs' Memorandum in Support of its Motion for Summary Judgment ("PM"), Plaintiffs have extensive evidence in support of its claims of secondary meaning, likelihood of confusion, and non-functionality under federal law. Plaintiffs' respectfully incorporate those arguments herein by reference in opposition to Walgreen's motion, and briefly comment further on Defendants' statements and allegations as set forth below.

---

[6]   To mask evidence and excuse its wrongdoing, Walgreen has: (a) ignored the signature looks of Luv n' care's trade dress, and (b) over-generalized the elements of the trade dress to the point where anyone could say that other competitors do that. (*See* SUF 43, 46, 49, 51, 65, 68, 71, all of which are disputed and are not based on good evidence) It then points to different individual features in different cups that might do one of the general things, even though no competitive cup out there, other than the knockoffs, combines all of the elements together, let alone in a way that would look like Luv n' care's cups. (AMF 110) At oral argument, when the Court actually looks at the different cup shapes, designs, styles and colors in the market (rather than Walgreen's small, distorted and unreliable pictures), it will be plain that Luv n' care's cups are primarily non-functional as defined by federal law.

III.    **PLAINTIFFS' FEDERAL CLAIMS ARE WELL GROUNDED**

   A.    **Plaintiffs' Product Design Trade Dress Has Secondary Meaning**

"Factors to be considered in determining whether a product's trade dress has acquired secondary meaning include: (1) sales success;[7] (2) the senior user's advertising expenditures; (3) unsolicited media coverage of the product; (4) consumer surveys; (5) intentional copying of the product;[8] and (6) length and exclusivity of the product in the market." *PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F.Supp. 394, 403 (S.D.N.Y. 1989). Notably, in regard to these factors, the Second Circuit has expressly stated that: "no single factor is determinative, and every element need not be proved." *Thompson Medical Co., Inc. v. Pfizer Inc*., 753 F.2d 208, 217 (2nd Cir. 1985); *PAF S.r.l.*, 712 F.Supp. at 403. Moreover, at the summary judgment stage, the evidence need not be sufficient in and of itself to establish secondary meaning, but need only establish an issue of material fact as to such.[9] The Second Circuit has even affirmed this Court's use of a "more likely than not" inferential standard for secondary meaning at trial.[10]

Additionally, when determining secondary meaning, it is not the general public's association that is at issue but, rather, the focus is on the relevant consumer group's state of mind. *PAF S.r.l.*, 712 F.Supp. at 402[11]. Here, the relevant consumer group consists of parents of baby's and toddlers, typically the mothers of such children.

There can be no doubt that Plaintiffs have, at the very least, raised a genuine issue of material fact as to the acquisition of secondary meaning by their trade dress. Indeed, as to sales

---

[7]    Rapid growth from a small beginning is itself impressive in the determination of secondary meaning. *Douglas Laboratories Corp. v. Copper Tan, Inc*., 210 F.2d 453, 456 (2nd Cir. 1954).

[8]    It is enough that act of copying shows "imitative intent". *Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc*., 1995 WL 241875, *9 (S.D.N.Y.) (finding secondary meaning despite absence of consumer survey and advertising expenditure evidence); *see RJR Foods, Inc. v. White Rock Corp*., 603 F.2d 1058, 1060 (2nd Cir. 1979) (designers patterned defendant's can closely after plaintiff's).

[9]    *U-Neek, Inc. v. Wal-Mart Stores, Inc*., 147 F.Supp.2d 158, 172 (S.D.N.Y. 2001); *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd*., 2000 WL 1028634, *21 (S.D.N.Y.) (articles, newsletters, e-mail messages, etc. were enough to establish an issue of material fact); *Boden Products, Inc. v. Doric Foods Corp*., 552 F.Supp. 493, 498 (N.D.Ill. 1982).

[10]    *See W.E. Bassett Co. v. Revlon, Inc*., 435 F.2d 656, 661 (2nd Cir. 1970) (through a course of steady promotion, plaintiff had more likely than not had enough effect "even if subconscious" on consumers to give the mark secondary meaning, and stating that: "an inference of secondary meaning, properly supported, seems to be enough.").

[11]    "It is merely necessary ... to show that a substantial segment of the relevant consumer group makes the association between the product and a single, albeit anonymous source." *Coach Leatherware Co., Inc. v. Ann Taylor, Inc*., 933 F.2d at 1222 (2nd Cir. 1991).

success, sales invoices, reports and spreadsheets show that parents nationwide repurchased Luv n' care cups at a high rate, totaling ***over 37 million cups sold in the first 2 years, during a period when about 8 million babies were born***, and ***over 94 million cups sold in 5 years***.  (AMF 70).  As discussed more fully in Plaintiffs' Memorandum in Support of its Motion for Summary Judgment, this evidence is compelling.  PM at 13-15.

Indeed, possibly, the only thing a mother holds more than her child is ***her child's sippy cups***, which she re-fills five to ten times a day, routinely picks up off the floor and repeatedly cleans and sanitizes.  (AMF 14).

In fact, Walgreen chose to buy and sell Luv n' care's cups *because they were already the most sought after childrens' cups in America.*  (AMF 81).  Consequently, Walgreen itself sold 2 million Luv n' care cups in 2005 and nearly 3 million in 2006.  (AMF 86).  Luv n' care did not just have "success" selling cups; Luv n' care dominated the market.  PM at 13-15.

Likewise, the sales evidence with respect to the comb and brush is also sufficient to create a triable issue of fact.  Specifically, over two million of these products have been sold since 2004.  (AMF 161)

In regard to advertising expenditures and effectiveness, Plaintiffs have spent over $1,100,000 on advertising its products, including, the products at issue in this lawsuit.  (AMF 73).  PM at 16-17.  This figure includes credits given to retailers for advertising they did to promote Luv n' care's products, but does not include the free advertising that numerous retailers did at no charge. (AMF 73).  Thus, even if Plaintiffs had not provided a single cent for such retailer advertising, such "free advertising" would still be invaluable.  Indeed, retailer advertising is one of the rare realms where manufacturers definitely get more than they pay for.  Through their circulars and other promotional pieces, the retailers speak directly to Plaintiffs' target market as they are preparing to shop and even while they are actively shopping.  Those circulars often featured Plaintiffs' products, and when they did, it was a win-win for the retailer and Plaintiffs because sales went off-the-charts compared to non-promotion weeks.  When a mother sees that sippy cup in an advertisement whether it be on the Internet, in a magazine or in a store circular, she recognizes it and it draws her into the store.

For example, Walgreen itself regularly promoted LNC's no-spill cups as "**WOW**" items in its circulars and in its stores.  Indeed, high consumer recognition and demand led stores like

10

Walgreen to promote Luv n' care's no-spill cups without charge. (AMF 74). None of those advertisements touted functional features but merely let the image of the product speak for itself. However, Walgreen has refused to produce any of its own advertising of these products and has failed to submit any of that evidence to this Court. Accordingly, all inferences on this point should be taken against it.

Walgreen also has not informed the Court that Walgreen approached Luv n' care to buy and sell the LNC no-spill cups as "**WOW**" items. (AMF 58,68,81). Walgreen wanted to have these cups and to promote them as "**WOW**" items because of their special appeal to consumers. (AMF 58,68,82). Walgreen's "**WOW**" item program is aimed at drawing consumers' into the store by focusing their attention on quality products that have special appeal such that consumers would naturally think, "Wow, those are products I want." (AMF 58,68,82).

Even just as to Plaintiffs' hard-spout no-spill cup, Walgreen's own "free advertising" resulted in an average of 85,000 units being sold during a promotional *week*, which occurred once a month or every other month. (AMF 59). During *non*-promotion weeks, Walgreen was selling 23,000 hard-spout cups, which still far outpaced its previous best selling cup, which had only sold 25,000 to 35,000 units *per year*. (AMF 59,84).[12]

The effectiveness of such advertising and the extent of consumer recognition is evidenced by consumer emails. For example, one consumer wrote: "Please don't think we are crazy. We have fell in love with a no-spill cup that we have purchased at Wal-Mart." (AMF 80). Another consumer was willing to travel fifty miles to buy Plaintiffs' no-spill cups. (AMF 80).

Regarding length and exclusivity of Plaintiffs' products in the market, Plaintiffs began selling their hard-spout no-spill cup in early 2003 and their soft-spout cup in late 2003. (AMF 15). By the time Walgreen's knock-off hit the market in or about October 2006, (AMF 100-01), Plaintiffs had enjoyed exclusive use of their trade dress for at least 3 years. With respect to the comb and brush, there has been exclusivity of at least 5-10 years (JHH 6-29 Dec. at 6).

In regard to unsolicited media coverage, Plaintiffs' Gripper Cup has won awards (AMF 76) as well as the reward of positive consumer feedback through an important element of the new media phenomena—the Internet blog. (AMF 78) Some consumers have even created their own website tributes to Plaintiffs' no-spill cups. (AMF 78). One Internet blogger has observed

---

[12]    Likewise, another retailing giant, Wal Mart, was also regularly advertising Plaintiffs' products and such advertising naturally featured photographs of the products themselves.

that Plaintiffs' no-spill cups "seem to run out as fast as water at many Wal-Mart locations. I have personally visited a Wal-Mart store and seen the huge bin full, only to return the very next day and see it almost empty."  (AMF 79).

In regard to intentional copying, the evidence shows that: Walgreen approached Luv n' care after Plaintiffs' no-spill cups had become America's best-selling cups, wanting to promote them as "WOW" products (AMF 58,68,81); participated in the enormous sales success of Plaintiffs' cups; deceived LNC into selling it an enormous amount of extra inventory (AMF 90-91); and then ditched LNC and its no-spill cups shortly after it began putting its virtually identical looking knock-offs onto the shelves right alongside LNC's no-spill cups.  (AMF 103-04).  Why would Walgreen have put its "WAGI"  knock-offs on the shelf right next to Plaintiffs' Gripper Cup under a big yellow sign promoting them as Luv n' care products, (AMF 104), if it did not want to convey to consumers that the products were the same product from the same or source, or authorized Luv n' care alternatives to one another?[13]  Moreover, in view of the facts and the striking similarity in appearance between the accused products and those of Luv n' care (see e.g. Complaint Ex. B, C and E), Walgreen's contention that it is did not copy is simply ludicrous and not credible.  In fact, its buyer couldn't tell which of the products in Exhibit C was the accused one and which was Luv n' care's.  Kruckman 30(b)(6) Dep. p. 96 lines 1-24.

The evidence also shows that the comb and brush sets were intentionally copied.  As shown in Ex. E of the Complaint, the accused comb and brush looks virtually identical to Plaintiffs'.  Furthermore, no other product looks like Luv n' care's.  JHH 6-29 Dec. at 5.  This was part of a pattern of copying (PM Ex. 8) to trade off the goodwill and recognition of Luv n' care in the marketplace.  JHH 6-29 Dec. at 6.

As to consumer surveys, the law does not require that the survey be performed by the plaintiff itself.  Here, a survey done by an entity *adverse* to Plaintiffs'— but aligned with Walgreen's interests: Royal King, the manufacturer of Walgreen's knock-offs.[14]  Royal King's consumer survey showed that Plaintiffs' hard-spout cup has acquired distinctiveness.  (AMF 148).  Indeed, Royal King's own survey showed that over 30% of targeted consumers (mothers

---

[13]   Indeed, the buyer said he "would think that if it were by a sign, the consumer would either pick up the item as it was a mistake or not."  (AMF 153)

[14]   Walgreen obtained a copy of this survey from *Royal King* in April 2009 and disclosed the survey's author as a *witness* shortly thereafter on April 10, 2009.  (AMF 163)

with young children) knew that Luv n' care's hard-spout cup came from one source just by looking at the cup, even in locations where Luv n' care selles fewer cups.[15]  (AMF 150).  Luv n' care's soft-spout cup is even more distinctive than the hard-spout cup, outselling it 2 to 1.

In sum, Plaintiffs have presented significant evidence going to every factor of secondary meaning, which is not even necessary at this stage.  *See PAF S.r.l.*, 712 F.Supp. at 403; *U-Neek, Inc.*, 147 F.Supp.2d at 172.  Thus, regardless of what this Court may feel about the weight or credibility of such evidence, which are improper considerations for this motion, the Plaintiffs have, at least, raised a genuine issue of material fact, as to secondary meaning.

### B.  Walgreen's Discussion of the Applicable Legal Standards is Misleading

In its motion, Walgreen attempts to mislead this Court as to the applicable legal standards for evaluating the elements of secondary meaning.

For example, as to sales success, Walgreen tries to misdirect this court into believing that Plaintiffs' sales evidence must somehow be "apportioned" between patents, trademarks and trade dress before it may be considered by this Court. DM at 15.  The Court of Appeals for Second Circuit has never required a Plaintiff to jump through such a preposterous set of hoops.  Plaintiffs' evidence shows that the stated revenue was generated via sales of the products at issue, and that is the only apportionment that is necessary.  Plaintiffs extremely large numbers of units sold throughout extremely large numbers of retail outlets is very pertinent evidence.  PM at 13-15.

Likewise, as to advertising evidence, Walgreen would have this Court believe that it cannot consider Plaintiffs' non-contracted advertising by retailers or other unmandated or free advertising. DM at 16.  However, all such evidence has strongly promoted Luv n' care's products nationally, regardless of whether or not Luv n' care paid for it.  (AMF 56)

As to consumer surveys, Walgreen tries to get this Court to believe that having no survey is "compelling evidence" against secondary meaning. DM at 13.  To support such overreaching, Walgreen primarily relies on indirect citation of non-binding cases from other jurisdictions and a single case from this Court that ultimately found the plaintiff had shown secondary meaning. *Id.*

Finally, Walgreen misdirects this Court by stating that intentional copying cannot form a

---

[15]   The survey was in high-end malls, which typically do not have stores that sell sippy cups, and in states that did not include nine of the top 10 states where Luv n' care sells its cups; instead, RK surveyed consumers in states where Luv n' care has less of a presence.  (AMF 149)

disputed issue of material fact. DM at 17.  Again it misstates the law.  Indeed, the case it uses as direct support of that purported rule actually states that: "[e]vidence of copying **can** help support ... a finding of secondary meaning." *Ergotron, Inc. v. Hergo Ergonomic Support Sys.*, 1996 WL 143903, *9 (S.D.N.Y.) (internal citation omitted).  Walgreen's is attempting to mask the legal truth that this Court and others within the Second Circuit have many times determined that secondary meaning was sufficiently shown even in the absence of a survey and even where the sales figures were plain and unparsed as to patents, trademarks and trade dress.[16]

Moreover, this Court has considered evidence of free advertising by retailers in support of secondary meaning and has rejected defendants' attempts to dismiss plaintiffs' proof of intentional copying.  For example, in *PAF S.r.l.*, during a bench trial, the plaintiff failed to present any consumer survey evidence as to secondary meaning.  *PAF S.r.l.*, 712 F.Supp. at 406. Instead, it presented evidence of sales success, advertising expenditures—*including substantial free advertising* done by its retailers —and unsolicited media coverage.  *Id.* at 403-406.

Additionally, in *PAF S.r.l.*, the plaintiff presented evidence that the defendant had intentionally copied its product design.  This Court stated that: "[p]roof of intentional copying is persuasive, if not conclusive evidence of secondary meaning."  *Id.* at 405. Accordingly, the Court held that plaintiff had sufficiently established secondary meaning.  *Id.* at 408.

Numerous other cases have found likewise with respect to intentional copying, advertising, and so forth, whether or not a survey was conducted.[17]

Accordingly, Plaintiffs's evidence, as further discussed in Plaintiffs' Motion for Summary

---

[16]  For example, in *U-Neek, Inc. v. Wal-Mart Stores, Inc*., 147 F.Supp.2d 158, 172 (S.D.N.Y. 2001), this Court found sufficient evidence to preclude summary judgment as to secondary meaning where the plaintiff submitted **no** survey evidence but only evidence of sales quantity, advertising, exclusivity of sales and affidavits of two retail buyers.

[17]  *See e.g., Fibermark, Inc. v. Brownville Specialty Products, Inc.*, 2005 WL 1173562, *5 (N.D.N.Y.) (defendant alleged other manufacturers produced products having the same look as the plaintiff's product and plaintiff presented evidence that defendant intentionally copied plaintiff's product's look, with sales success, and exclusive use for a period of years, but without survey evidence.  In light of the competing factors defendant's motion for summary judgment denied due to triable issue on secondary meaning); *Bally Midway Mfg. Co. v. Amer. Postage Machine, Inc*., 1983 WL 1150, *3 (E.D.N.Y.) (Plaintiff presented no survey evidence, but submitted evidence of advertising, sales success and unsolicited media exposure, and intentionally copying by defendant, which the court found may constitute "significant evidence" of secondary meaning.   Thus, despite the lack of any direct consumer evidence, the court held that: "the evidence submitted is more than sufficient to justify the inference of secondary meaning."); *Yurman Design, Inc. v. Golden Treasure Imports, Inc*., 275 F.Supp.2d 506, 513 (S.D.N.Y. 2003) (intentional copying, advertising expenditures, and media attention)

Judgment, very well demonstrates secondary meaning, or *at the very least*, raises a genuine issue of material fact such that this Court should deny Walgreen's request for summary judgment.

### C.    Plaintiffs' Trade Dress is Primarily Non-Functional

#### 1.    The Definition of Legal Functionality is not Based on Whether a Feature has a "Function"

Trade dress is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 Fed. Appx. 615, 617 (2nd Cir. 2008) (unpublished). Thus, the guiding legal principle of functionality is whether the trade dress is essential -- i.e. whether competitors have to copy that trade dress because of the article's nature. *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 1339 (CCPA 1982). Moreover, as further discussed below, it is not the function of a particular design element which is relevant, but the combination of all the design elements which produces the claimed trade dress as a whole. *Cartier,* 294 Fed. Appx. at 620-621.

Thus, simply because an article or its elements perform a function, does not make the design functional in the legal sense. These principles are well-established in the Second Circuit.[18] For example, twenty-four years ago in *Lesportsac Inc. v. K Mart Corp.*, 754 F.2d 71 (2nd Cir. 1985), the Second Circuit stated that to be deemed functional, "a feature that merely accommodates a useful function is not enough." *Lesportsac,* 754 F.2d at 76.

In contrast, Walgreen has attempted to obfuscate and confuse this court by using the lay meaning of the word "function" instead of its legal meaning, which is directed to whether the design as a whole is essential. Thus, Walgreen tries to mislead this Court by stating that evidence of alternative designs is "not relevant to" functionality. DM at 23.

Walgreen position is dead wrong, and totally inconsistent with the established law in this Circuit that alternative designs is centrally relevant to the functionality inquiry. For example, in *Brandir International, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142 (2nd Cir. 1987), the Second Circuit expressly stated that it is "the absence of alternative constructions performing the same function that renders the feature functional." *Brandir Int'l, Inc. v. Cascade Pacific Lumber*

---

[18]   Likewise, in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2nd Cir. 1979), the Second Circuit rejected an argument of functionality stating: "we do not agree that ... because an item is in part incidentally functional, it is necessarily precluded from being designated as a trademark." *Dallas Cowboys*, 604 F.2d at 203, 204 n. 4 (looking at combination of elements in plaintiff's uniform forming trade dress).

*Co.*, 834 F.2d 1142, 1148 (2d Cir. 1987).  "[T]he fact that a design feature performs a function does not make it essential to the performance of that function."*Id*.  In *Brandir*, upon finding that bicycle racks could be designed in numerous ways, the Second Circuit reversed the district court's grant of summary judgment to the defendant on plaintiff's claim of trade dress in the design of its undulating bicycle rack.  *Id*. at 1149. This principle -- which Walgreen flatly denies (DM at 23) -- was recently reaffirmed yet again in *Cartier*[19].

Here, Walgreen's own evidence demonstrates that Plaintiffs' trade dress is nonfunctional. Walgreen has produced evidence of a plethora of alternative designs.  DM at 6.  Plaintiffs'  have as well, with respect to both the cups at issue and the comb and brush.  PM 23; D.E. 46; D.E. 56. As shown, for example, the Declarations of Mr. Malynn (D.E. 46, Ex. A-EE, GG, HH) and Mr. Cohen (D.E. 56 Ex. A), the alternative designs look quite different than Plaintiffs' products.  To further demonstrate this, Plaintiffs request the opportunity to display physical samples of those products to the Court at oral argument, so that the Court can directly and clearly see examples of the numerous alternative designs on the market, and how they differ in appearance from Plaintiffs' products.

### 2.    *Functionality is Determined on the Basis of the Whole, not its Parts*

Walgreen likewise improperly attempts to confuse issues by arguing the functionality of design "elements", which is also contrary to the established legal principles.  It is not the function of a particular element which is important, but the combination of all the design elements which produces the trade dress as a whole.  *Cartier,* 294 Fed. Appx. at 620-621 ("The district court explained that it was improper for defendants to break the trade dress down into specific elements and call them functional, *because plaintiffs' claim is that the combination and arrangement of those design elements comprise the trade dress at issue*.") (emphasis added).  In fact, the Lanham Act, expressly states that to determine whether a mark is functional, it must be considered "on the whole."  15 U.S.C. § 1052(e)(5).

Thus, in both *Cartier and Lesportsac*, the Second Circuit rejected the defendant's attempt to break the plaintiff's trade dress down into individual elements and attack each element as

---

[19]   A product design is functional when "certain features of the design are essential to effective competition in a particular market." *Cartier,* 294 Fed. Appx. at 620, citing, *Landscape Forms, Inc. v. Columbia Cascade Co.,* 70 F.3d 251, 253 (2d Cir. 1995).  "In other words, the absence of alternative constructions performing the same function . . . renders the feature functional." *Cartier,* 294 Fed. Appx. at 620 (internal quote omitted).

functional. In *Lesportsac,* for example, the Second Circuit stated that: "K Mart misconceives the scope of the appropriate inquiry. Lesportsac does not claim a trademark in all lightweight nylon bags using hollow zipper pulls or carpet tape trim. It claims as its mark the particular combination and arrangement of design elements that identify its bags. . .." *Id.* "K Mart's ability to compete is not unduly hindered by the determination that Lesportsac's particular configuration of design features is nonfunctional and therefore eligible for protection" [20].

Accordingly, this Court should reject Walgreen's yet further attempts to distort the applicable legal principles. The numerous alternative designs cited by both Walgreens and Plaintiffs demonstrate that there are many different ways to create a look for a children's cup.[21] This all demonstrates that the trade dress here is non-functional.

### 3. Walgreen's "Evidence" Does Not Demonstrate Non-Functionality

Thus, Walgreen's own "evidence" does not demonstrate functionality, but rather the opposite. The existence of alternative designs demonstrates non-functionality. Likewise, Walgreen has f

urther resorted to the utterly discredited tactic of breaking Plaintiffs' trade dress down into individual, "unprotectable elements" (DM at 2), when federal law provides that a distinctive combination of common or functional features can obtain trade-dress protection.

Moreover, Walgreen distorts the record when it states that "Plaintiffs admit that numerous competitors use each and every allegedly protectable feature of Plaintiffs' alleged sippy cup design trade dress." (DM at 2) There is *no* such admission anywhere. Plaintiffs denied that any competitive cups look like Luv n' care's cups, other than the Walgreen/Royal King knockoffs (and a Munchkin knockoff). (AMF 145). Plaintiffs also denied that there were any competitors (other than Royal King and Munchkin) that were even using even *some* of the

---

[20]    *See also, Eliya, Inc. v. Kohl's Department Stores*, 2006 WL 2645196, *4 (S.D.N.Y.); *E-Z Bowz, LLC v. Professional Product Research Co., Inc*., 2003 WL 22068573 *21, 24 (S.D.N.Y. 2003) (proper inquiry is whether trade dress, viewed as a whole, is not functional); *Metro Kane Imports, Ltd. v. Rowoco, Inc*., 618 F.Supp. 273, 275-76 (S.D.N.Y. 1985) (attempt to break down design to prove that various elements are functional misconceives the nature of the inquiry, for MKI seeks protection for the combination and interaction of the various elements which might individually be functional"); *see Callaway Golf Co. v. Golf Clean, Inc*., 915 F.Supp. 1206, 1213 (M.D.Fla. 1995) (entire trade dress may be protected even if elements are functional).

[21]    *See also*, *Carol Cable Co., Inc. v. Grand Auto, Inc*., 1987 WL 14544, *3 (N.D.Cal. 1987) (by submitting examples of other companies' booster cable packaging, defendant demonstrated that any functional aspects could be communicated in ways distinct from plaintiff's trade dress);

individual features found in Luv n' care's cups.  (AMF 146).

This Court should not be distracted by Walgreen's misinformation.  The 'common' nature of individual features is <u>not</u> the point.  The real question at the heart of the functionality inquiry is whether the <u>combination and arrangement</u> of all features of the trade dress—some or all of which may be individually commonplace—is **essential**.  *See Lesportsac*, 754 F.2d at 76; *Cartier*, 294 Fed.Appx. at 620-21; *Eliya, Inc.*, 2006 WL 2645196, *4; *E-Z Bowz, LLC*, 2003 WL 22068573 *21, 24; *Metro Kane*, 618 F.Supp. at 275-76.  'Common' individual elements and an 'essential' overall combination are not legally synonymous or equivalent.  Walgreen has provided absolutely no evidence that the unique appearance, combination and arrangement of all the features that, *together*, comprise Plaintiffs' trade dress are "essential."  Indeed, Walgreen could have copied Avent's cup, or Playtex's cup, or Gerber's cup, or any of numerous other cups that perform the same function but look quite different.  It did not copy Luv n' care's cup because it was essential to do so to make a cup.  It copied because it wanted to confuse consumers by trading off of the popularity of the leading children's cup in the market.  Walgreen's actions were solely the result of its ***own failure -- indeed its refusal -- to seek out reasonable alternatives***.  *See, Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 22 (7th Cir. 1992)

In fact, Walgreen and Atico have admitted that: "Other competing products, like Munchkin, Babies R' Us, Gerber, Playtex and Avent, ***look different*** from defendants' asserted trade dress even if they may have certain similar functional features."  Florida action (S.D.Fla., case no. 09-60397) D.E.# 31, at ¶37; D.E.#1, at ¶34 (emphasis added).[22]  Additionally, Walgreen and Atico have stated that: "Walgreens purchases sippy cups from Atico's competitors, including Gerber, Playtex and Avent, just not Luv N' Care's sippy cups."  Florida action (S.D.Fla., case no. 09-60397) D.E.# 31, at ¶24; D.E.#1, at ¶21.  If they all truly looked alike, why would Walgreen have to carry so many different brands?  Especially since Walgreen's buyer stated that: "It matters what it looks like. It doesn't matter whose name is on it."  AMF 154.

Furthermore, Walgreen presented no evidence that it was materially costly to design around Plaintiffs' trade dress, i.e. that Walgreen would be materially and adversely affected in its ability to market a non-infringing product of comparable price and quality.  *See Abbott Labs*, 971

---

[22]  Plaintiffs respectfully request that the Court take judicial notice of Walgreen and Atico's factual statements in the Florida action pursuant to Federal Rule of Evidence 201.

F.2d at 20-21.  To the contrary, Kruckman[23] stated the non-essential nature of the outward design of these cups when he explained that the only "starting criteria" were "a vessel, a cap and a spout."  (AMF 155)  This is all it had to have.  He named no particular shape for the vessel and cap, no particular requirement for tinting or coloring, and no particular shape for the spout (*see id.*) and acknowledged that there were many variations possible.  PM at 24.  This is also contrary to Walgreen's false statement in its brief that all sippy cups have "raised caps, coloring, tinting, hourglass or cup shapes and spouts."  DM at 23.

Mr. Kruckman also stated he had to approve the cups' "look."  (AMF 158).[24]  To be sure, appearance was one of the factors that Kruckman took into consideration when he determined whether or not to buy the knock-off from Royal King (through Atico).  (AMF 159).  In Kruckman's opinion, not all sippy cups are equally nice in terms of appearance; some are nicer than others.  (AMF 160)

### 4.   Many Courts Have Found Liquid Containers are Non-Functional

Numerous courts have considered the functionality issue in reference to trade dress comprised of a container for liquids.  Those courts have repeatedly found containers for liquid to be nonfunctional.[25]  As the *Mogen David* court held, a bottle's design is so arbitrary in nature that prohibiting a competitor from copying it is insignificant in comparison to a plaintiff's right to protection from likelihood of confusion in the trade. *Mogen David*, 51 C.C.P.A. at 1270.

Likewise, in *Jordan,* for example, there was evidence of alternative designs for spice

---

[23]   Kruckman was Walgreen's baby sundries buyer during the period of time relevant to this action.  (AMF 156)

[24]   Kruckman also states that design changes for sippy cups "could come from any number of places" including "consumers, factories, trade companies, buyers. . ."  (AMF 157)

[25]   *See, Morton-Norwich*, 671 F.2d at 1341-42 (a bottle can have an infinite variety of designs and function to hold liquid; evidence of competitors' bottles showed that functions could be performed by other shapes -- one need not copy trade dress); *Inverness Corp. v. Whitehall Laboratories*, 678 F.Supp. 436, 440 (S.D.N.Y. 1987) (same); *Radical Products, Inc. v. Sundays Distributing*, 821 F.Supp. 648 (W.D. Wash. 1992) (bottle nonfunctional because plaintiff's bottle unique and other competitors did not find it necessary to adopt same trade dress); *Sundor Brands, Inc. v. Borden, Inc*., 653 F.Supp. 86, 92 (M.D.Fla. 1986) ("[i]f there are numerous other ways to package or bottle or shape the product ... functionality is incidental and the right of the manufacturer to differentiate his product should be paramount); *Robarb, Inc. v. Pool Builders Supply of the Carolinas, Inc*., 696 F.Supp. 621, 625 (N.D. Ga. 1988); *Jordan Int'l, Inc. v. United Indus. Sales Org., Inc*., 699 F.Supp. 268 (S.D.Fla. 1988) (test boils down to whether competitors need to copy the configuration or whether there are alternative ways to shape the product); *Application of Mogen David Wine Corp*., 51 C.C.P.A. 1260, 328 F.2d 925 (C.C.P.A. 1964) (a bottle shape can be protected as trade dress).

shakers which were the subject of design patents and did not bear a resemblance to the spice shakers at issue. The court found that those alternative designs was relevant to functionality because their mere contemplation by inventors and manufacturers tended to show that protection of the subject trade dress would not deprive competitors of something essential to competition. *Jordan Int'l*, 699 F.Supp. at 270[26]. Here too, the numerous design patents which do not bear any resemblance to the cups in this case, all demonstrate non-functionality. (D.E. 46, Ex. A-EE, GG, HH).

Moreover, the courts have also looked at whether the defendant ***failed to timely develop or seek out reasonable alternatives***. *Abbott Labs*, 971 F.2d at 22 (emphasis added). Plainly, Walgreen had other options here. It choice was to engage in piracy, and not dictated by any essential "functional" need to adopt Plaintiffs' trade dress.

In sum, the record evidence shows that Plaintiffs trade dress is primarily non-functional and that competitors are fully capable without any material disadvantage of offering consumers products of comparable price and quality without knocking-off the unique appearance, combination and arrangement of features that, *together*, comprise Plaintiffs' trade dress.

### 5. The Impact of Utility Patents on the Evaluation of Functionality

Defendant argues that certain utility patents show that Plaintiffs' trade dress is functional. Def. Mot. at p. 9-11, 21-22. To support this argument, the Defendant relies on, and misconstrues, *Traffix Devices, Inc. v. Marketing Displays, Inc.* 532 U.S. 23, 121 S.Ct. 1255 (2001). In particular, Defendant quotes the following statement: "A utility patent is strong evidence that the features therein ***claimed*** are functional." *Traffix*, 532 U.S. at 30 (emphasis added herein). But in *Traffix*, the central advance claimed in the utility patent was <u>also</u> the essential feature of the trade dress at issue. *Traffix*, 532 U.S. at 30.[27] This is not the case here.

Here, Defendant did not even state what the central advances <u>claimed</u> in the various utility patents are. Instead, Defendant only vaguely argues that they "***disclose*** and, in many cases, *claim* various features of the asserted products." Def. Mot. at p. 21. Even in Defendant's allegations of fact, it did not state what the "claims" of the subject patents are. Instead, it could

---

[26] *See also, Thomas & Betts Corp.*, 138 F.3d at 299 (finding no requirement that alternative shapes must have been successfully marketed to show that effective competition is possible)

[27] Indeed, the Court noted that: "the central advance claimed in the expired utility patents (the Sarkisian patents) is the dual-spring design; and the dual-spring design is the essential feature of the trade dress MDI now seeks to establish and to protect." *Traffix*, 532 U.S. at 30.

only discuss incidental "disclosures" of non-essential features for the embodiment of the invention. *See* Def. Mot. at p. 9-11.

The key to the determination of whether the subject utility patents are relevant to the issue of functionality is a determination of whether the trade dress forms the central subject matter of claimed in the utility patent claim.[28] Indeed, without proper determination of what the claims of the subject utility patents are, this Court may not consider them as relevant evidence, let alone undisputed fact. Here, Walgreen failed to conduct any claim construction during discovery, and no Markman Hearing was ever requested or conducted, so Walgreen has completely failed to provide any material legal evidence on this issue. *See Keystone Mfg,* 394 F.Supp.2d at 562 ("A *Markman* hearing will be scheduled in advance of trial for purposes of determining the evidentiary value under *Traffix,* if any, of the '476 patent.")[29].

Furthermore, the subject patents show that there is no overlap between the "central advance" of the patents and the essential features of Plaintiffs' trade dress. Plaintiffs' trade dress focuses on the ***outer*** appearance of Plaintiffs' products. (AMF 21) On the other hand, in each of the subject patents, its **claims** or central advance focuses on the ***inside*** of the product, namely, a spill proof valve and liquid dispensing system that is ***internal*** to the cap or spout. (AMF 21) As discussed in the Declaration of Mr. Cohen -- who wrote and prosecuted the patents at issue at the Patent Office -- the patents at issue are directed to new valves for preventing spillage. (AMF 21) Many different variations of the ***outward*** appearance of Plaintiff's trade dress can be provided aside from the claimed internal valve technology of the cup. One is external and one is internal. Accordingly, there is no overlap between the "central advance" of the patents and the essential features of Plaintiffs' trade dress, and the patents are not relevant.

---

[28] *See Keystone Mfg,* 394 F.Supp.2d at 561-62; *Leviton Manufacturing Co., Inc. v. Universal Security Inst.s, Inc.*, 304 F.Supp.2d 726, 735 (D. Md. 2005) ("*Traffix* does not dictate a finding of functionality where a patent has been issued. Rather, the Court prohibits affording trade dress protection of the *central advance* of an existing patent.").

[29] *E-Z Bowz*, 2003 WL 22068573 *22-23 (S.D.N.Y. 2003) (noting that utility patent claimed features that were identified as trade dress but denying summary judgment because the trade dress also included non-claimed features, and proper focus of the inquiry is the totality of the trade dress not individual elements); *Clark Tile v. Red Devil Tile, Inc.,* 2007 WL 4335436, *8 (N.D. Ill.) (holding that where features of the trade dress are disclosed but not essential to the claimed invention, summary judgment is inappropriate).

21

Furthermore, the Supreme Court did **not** foreclose the possibility that a plaintiff could show that its trade dress is non-functional even when a utility patent exists <u>claiming</u> the same features (which is not the case here). Indeed, the Supreme Court stated that:

> In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain. There the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent.

*Traffix*, 532 U.S. at 34.[30]   Here, the disclosures that Defendant cites clearly use language indicating that the features cited are non-essential to the embodiment of the invention.[31]

In sum, Plaintiffs have obtained a series of patents which focus on valve technology. Plaintiffs' trade dress is neither essential to nor claimed in these patents. Under *Traffix* and its progeny, the subject patents are irrelevant to the issue of functionality and should be disregarded.

### 6.  The USPTO Does Not Consider the Trade Dress to Be Functional

Furthermore, Luv n' care has a design patent pending on the soft top cup product which is at issue in this litigation. (AMF 44) At no time during prosecution to date has the U.S. Patent Office ever indicated it considers the design of that product to be primarily functional. This is significant since, by law, design patents can only protect ornamental – i.e. <u>non-functional</u> – designs. *See,* 35 U.S.C. 171; See, PM at 23. Likewise, the U.S. Patent Office has routinely issued design patents protecting the external appearance of no-spill cups. PM at 23, (D.E. 46, Ex. A-EE, GG, HH).

## III. BECAUSE WALGREEN'S HAS NOT PRODUCED DISCOVERY AND FULLFILLED ITS RULE 30(b)(6) OBLIGATIONS, WALGREEN'S MOTION SHOULD BE DENIED OR CONTINUED

Federal Rule of Civil Procedure 56(f) governs requests for additional discovery in connection with summary judgment proceedings. "If a party opposing the motion shows by

---

[30]  *See also, Keystone Mfg Co., Inc. v. Jaccard Corp.,* 394 F.Supp.2d 543, 551 (W.D.N.Y. 2005) ("Under *Traffix*, the existence of an expired utility patent is strong evidence of functionality, but it does not bar the application of trade dress protection to portions of the covered design determined to be non-functional."); *Metrokane, Inc. v. Wine Enthusiast,* 160 F.Supp.2d 633, 638-39 (S.D.N.Y 2001) (trade dress protection appropriate where overall "rabbit" shape of corkscrew was non-functional despite the fact that the corkscrew incorporated functional aspects of the patent).

[31]  For example, "the spout is *preferably* a soft spout"; "this grip *can be* in the form of a series of contours in the cup"; "The nipple *can be* constructed out of *any* of the flexible materials." DM at 10.

22

affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or, (3) issue any other just order." Fed.R.Civ.Proc. 56(f). Courts of this Circuit recognize that Rule 56(f) "should be applied with a spirit of liberality."[32] *John Hancock Property and Cas. Insur. Co. v. Universale Reinsurance Co., Ltd.,* 147 F.R.D. 40, 47 (S.D.N.Y. 1993). Indeed, "summary judgment should not be granted when [the party] is denied reasonable access to potentially favorable information." *Robinson v. Transworld Airlines, Inc.,* 947 F.2d 40, 43 (2nd Cir. 1991). Because this is exactly the case here, Walgreen's motion should be denied or continued pursuant to Rule 56(f).

Presently, Plaintiffs are proceeding to trial and having to oppose this motion without Walgreen producing a *single document* in response to Plaintiffs' timely document production requests, or providing a *single answer* to Plaintiffs' timely interrogatories and requests for admission.[33] (AMF 123,125). This is unjust. After stonewalling on discovery and Atico, Walgreen then stonewalled Plaintiffs at deposition. Its Rule 30(b)(6) witness -- the very Walgreen buyer who commissioned, named and approved the Royal King knockoffs -- could not remember anything, did not know anything, and could not be sure about or recall anything. He said "I don't know" or a variation thereof at least 350 times during deposition.[34] (AMF 132).

---

[32]    Where, as here, the facts or materials necessary to rebut summary judgment are in the exclusive control of the moving party, courts should routinely grant Rule 56(f) relief. *See e.g. Ward v. U.S.,* 471 F.2d 667, 670 (3rd Cir. 1973) (when facts are in movant's control and additional discovery was needed, "a motion for continuance of a motion for summary judgment for purposes of discovery should, we think, ordinarily be granted almost as a matter of course"); *accord Doe v. Abington Friends School,* 480 F.3d 252, 257 (3rd Cir. 2007) ("'district courts usually grant properly filed Rule 56(f) motions as a matter of course.' . . . This is particularly so when there are discovery requests outstanding or relevant facts are under the control of the moving party.") (citation omitted).

[33]    Furthermore, Plaintiffs require discovery from Walgreen's in-house supplier, Atico International ("Atico"), who contracted with Walgreen and Royal King. In a blatant violation of Rule 26 of the Federal Rules of Civil Procedure, Walgreen did timely not identify Atico as a person with knowledge in its initial disclosure. (AMF 116) Plaintiffs have moved to join Atico as an indispensible party. (AMF 121)

[34]    Thus, Plaintiffs requested the opportunity to file discovery motions. However, the Court deferred Plaintiffs' pre-filing request, directing the parties to continue to meet and confer. (AMF 136) Walgreen then proposed sitting, again, for deposition, a proposal Plaintiffs have tentatively accepted, subject to the dates Walgreens offers for its continued deposition. (AMF 139) In the meet and confer, Walgreen acknowledged that ***it might in fact have to produce three (3) witnesses to fulfill its Rule 30(b)(6) obligations***, even as narrowly viewed by Walgreen. (AMF

There can be no dispute that Walgreen has <u>not</u> fulfilled its Rule 30(b)(6) obligations which even Walgreen has reluctantly conceded.[35]

Plaintiffs are entitled to first obtain Walgreen's responses and then finish its deposition before its motion is considered. Neither due process nor the Federal Rules of Civil Procedure contemplate or permit a decision on the merits under *Celotex*, without discovery. Because Plaintiffs' written discovery and document requests were timely when issued, and because Walgreen has acknowledged that it needs to sit for its deposition and fulfill its obligations, and because Walgreen knowingly violated Rule 26 by hiding Atico's identity, Walgreen's motion must be denied or continued. Walgreen's failure to appropriately identify Atico is particularly egregious because Walgreen repeatedly denied knowledge of events at deposition, pointing to Atico as the person with knowledge. (AMF 135). As set forth in the Supplemental Declaration of Morris Cohen and the Declaration of Rochelle Weisburg, the responses and depositions are necessary before any ruling on Walgreen's motion is even considered. (AMF 126) The facts sought, how they will be obtained and how they will raise additional genuine issues of material fact, and Plaintiffs' efforts to obtain such discovery and navigate the Court's orders and pre-filing practice are plainly set forth in Plaintiffs' Statement of Additional Material Facts and Declarations of Cohen and Weisburg. (AMF 125,128,136).

Plaintiffs timely propounded document requests, requests for admission, and interrogatories in accordance with its understanding that the Court originally directed a discovery cut-off of May 7, 2009 in this case. (AMF 115,123).[36]    However, Walgreen subsequently objected and refused to produce *any* discovery in reliance on the Court's order – issued *after*

---

139) However, Walgreen has steadfastly **refused** to produce any documents unless ordered by the Court. (AMF 125)

[35]  At deposition, its 30(b)(6) witness, Kruckman, could not recall or did not know the answers on nearly every topic he was designated to testify on. (AMF 132-34)  In fact, Walgreen has subsequently conceded that Kruckman needs to be properly prepared for deposition and that it may possibly designate two additional witnesses to fulfill its 30(b)(6) obligations.  (AMF 138). It's failure to properly do so beforehand is simply and indisputably prejudicial.

[36]  Plaintiffs' earlier understanding from the November 7, 2008 status conference was that the Court directed that discovery would be conducted until May 7th  at which time there would be another conference as to status.[36] (AMF 115)  As officers of the Court, Walgreen's attorneys cannot reasonably dispute this fact.

Plaintiffs timely propounded the discovery – setting a cut-off was May 1, 2009.[37]  (AMF 125)
According to Walgreen, that made Plaintiffs' document requests and written discovery untimely.
(AMF 125)

Furthermore, Plaintiffs previously wished to move the court for an extension of the
discovery period in view of Walgreen's stonewalling on important discovery, including that of
Atico, and in view of extreme extenuating circumstances beyond its control that have
accompanied this case, including, serious illnesses and deaths affecting Plaintiffs' closely held
family company and an unusual number of concurrent other litigations.  (AMF 162)  However,
Plaintiffs were never given the opportunity to file a motion or be heard on those and other issues,
which it respectfully submits violates due process and has prejudiced its rights, and has
interfered with its ability to fully and fairly pursue a meritorious action.  (AMF 162; *Richardson
Greenshields Secur., Inc. v. Mui-Hin Lau*, 825 F.2d 647, 652 (2d Cir. N.Y. 1987).

Based on Walgreen's admitted failure to fulfill its Rule 30(b)(6) obligations, knowing
violation of Rule 26, failure to produce documents (including those it is relying on in its motion),
and Plaintiffs' Rule 56(f) showing, it would constitute error to deny the requested discovery.
*Ruotola v. Dept. of Justice, Tax Division,* 53 F.3d 4, 11 (2nd Cir. 1995) (court erred in granting
summary judgment where plaintiff had requested documents but defendant had objected and
refused to produce same); *Meloff v. NY Life Insurance Co.*, 51 F.3d 372 (2nd Cir.1995) (vacating
summary judgment where discovery responses had not been received in time for sufficient
analysis prior to filing opposition to motion for summary judgment).  The Defendant's attempts
to thwart discovery and the need for additional depositions further supports this finding[38].

## CONCLUSION

In light of the foregoing facts and law, Plaintiffs' respectfully request that this Court deny
Defendant Walgreen's motion for summary judgment.

---

[37]  In contrast, Walgreen has obtained the benefit **of over 200,000 pages** of Plaintiffs' relevant
discovery and its interrogatory responses.  (AMF 117-119)
[38]  *See also, Moss v. Enlarged School Dist. Of the City of Amsterdam,* 166 F.Supp.2d 668, 672
(N.D.N.Y. 2001) (granting Rule 56(f) relief and denying motion for summary judgment without
prejudice where movant filed affidavit revealing, *inter alia,* non-movant's effort to thwart
discovery); *Antonios Alevizopolous and Assoc. v. Comcast International Holdings, Inc.*,  100
F.Supp.2d 178, 185 (S.D.N.Y. 2000) (denying motion for summary judgment where, although
some discovery had been completed, further depositions were required).

Dated: June 29, 2009                        Respectfully submitted,

**LAW OFFICES OF MORRIS COHEN, P.C.**
One Penn Plaza, Suite 2527
New York, NY 10119
Telephone: 212-244-4111, ext. 226.
and
**FELDMAN GALE, P.A.**
One Biscayne Tower, 30th Floor
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone:  305-358-5001
Facsimile:  305-358-3309

By:  /s/Morris E. Cohen_____
     Morris E. Cohen / MC-4620
     E-mail: mcohen@ipcases.com
     James A. Gale / Fla. Bar no. 371726
     E-mail: JGale@FeldmanGale.com
     ***Attorneys for Plaintiffs.***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on this 29th day of June 2009, I electronically filed the foregoing document with the Clerk of the Court using its CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached service list in the manner specified either via transmission of Notices of Electronic Filing generated by this Court's CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

_/s _ _____
MORRIS E. COHEN

## <u>SERVICE LIST</u>

*Luv N' Care, Ltd.,  et al. v. Walgreen Co., et al.*
Case No. 08-civ-4457 (DC)
United States District Court, Southern District of New York

Alan Weisberg
aweisberg@cwiplaw.com
Jason Buratti
jburatti@cwiplaw.com
Jeffrey H. Kamenetsky
jkamenetsky@cwiplaw.com
Christopher & Weisberg, P.A.
200 East Las Olas Blvd., Suite 2040
Ft. Lauderdale, FL 33301
Phone: 954-828-1488
Facsimile: 954-828-9122
*Via CM/ECF.*